PHILIP G. JOHNSTON et al. v. STAR BUCKET PUMP COMPANY, Appellant.

In Banc, April 27, 1918.

1. REFERENCE: Compulsory: Issues at Law: Review of Findings in Appellate Court.

*Held,* by GRAVES, C. J., with whom BLAIR and WILLIAMS, JJ., concur, that a case involving a long and intricate account, in which every issue is an issue at law, is one for compulsory reference, but is, nevertheless, a law case, and not the subject of equity cognizance; and that in a case of compulsory reference, where the issues involved are issues purely at law and wherein the trial court has approved the referee's findings, such findings, so approved, will not be disturbed by the appellate court, if there is substantial evidence to sustain them,

but such findings stand in the appellate court upon the same plane as a verdict of the jury in a law case, or as the findings of the court sitting as a jury in a law case.

*Held,* by BLAIR, J., concurring, with whom GRAVES, C. J., and WILLIAMS, J., concur, that the mere presence of a long account does not make operative the equitable rule of review on appeal, but the adoption of such a rule in reference cases involving only issues of law would require the appellate courts to review the weight of the evidence in all actions at law involving the examination of long accounts, whether they be cases referred or cases tried to the court or before a jury.

All the reference statutes from the organization of the State govment to the present time, including "Practice in Chancery" and "Practice at Law" in Revised Statutes of 1845, and the footnote on page 199 of Revised Statutes of 1855, and all prior decisions, are elaborately reviewed in the two opinions, and the conclusion reached that, whatever may be or has been said of the power of trial courts over the findings of a referee, an appellate court in a compulsory reference case involving only issues at law is bound by the findings of fact made by the referee and approved by the trial court to the same extent as in other actions at law.

*Held,* by BOND, J., dissenting, with whom WALKER and WOODSON, JJ., concur, that a long and intricate account not adapted to a trial by a jury, has been the basis of jurisdiction in equity from the enactment of the first reference statute in 1807 (Geyer's Digest Mo. Laws, p. 256, secs. 36 and 37) down to the present, irrespective of whether the items of the account are legal or equitable in their nature; and that fact authorizes circuit courts to exercise their chancery powers in dealing with a case of compulsory reference, and the appellate court on appeal to review the findings approved by the trial court and to render judgment as in other equity suits. The former decisions are reviewed, and the conclusion is reached that the decision in State to use v. Parker-Washington Co., 271 Mo. 229, that a review on appeal in a compulsory reference case can go no further than to ascertain if there is any substantial evidence supporting the judgment of the trial court, is supported neither by the statutes, the Constitution, nor the former adjudications in this and other states.

2. ————: ————: **Effect of Constitution of 1875.** Whether or not a long and intricate account throws the case into equity, the compulsory reference statute is not violative of the Constitution of 1875; for the Constitution only guarantees a trial by jury "as heretofore enjoyed," and long prior to its adoption the statutes (the same in all their essential provisions as they are now, and as previously interpreted by the Supreme Court) did not permit trial by jury in either actions at law or suits in equity involving long accounts.

3. **BUILDER'S CONTRACT: Breach: Architect's Fraud: Quantum Meruit: Counterclaim: Credit for Payments.**

*Held*, by GRAVES, C. J., with whom BLAIR and WILLIAMS, JJ., concur, FARIS, J., concurring in the result, that if the owner of the building breached the contract, by refusing to pay the contractor what was clearly due both by the terms of the contract and by agreement after full examination, he cannot re-recover in his counterclaim to the contractor's suit in *quantum meruit*, as for payments made, for sums he paid sub-contractors to finish the building after his breach, unless they were paid by the contractor's direction. So that where the contract made the architect the final judge on disputed questions arising during the progress of the building, and payments were to be made monthly for eighty-five per cent of all work and materials in place, upon the certificate of the architect, and at the end of a certain month both the owner and contractor agreed and the architect adjudged that a certain sum was due, but the owner refused to pay and because of that refusal alone the architect refused to issue the certificate, the architect was guilty of legal fraud and oppression, and the owner breached the contract by refusing to pay, and can claim, in his counterclaim averring payment, no payments subsequently made to sub-contractors.

*Held*, by BOND, J., dissenting, with whom WALKER and WOODSON, JJ., concur, that the contractor breached the contract, for the reasons (1) there was a dispute between the parties as to the amount due at the end of said month, (2) the contract stipulated that no payments were to be made except upon the certificate of the architect, (3) the evidence shows the architect refused to issue the certificate because of defective work and material, (4) in the absence of fraud on the architect's part the owner was entitled to stand on the contract to pay only on the architect's certificate, and (5) the contractor has not sustained the burden of showing the architect was guilty of wrongdoing in withholding the certificate.

*Held*, further, that to permit the contractor, in his suit in *quantum meruit*, to recover for the reasonable value of the work done and material furnished, while refusing to allow the owner credit for money he actually paid to sub-contractors for finishing the building according to their contracts, is inequitable, and violates the rule that he who seeks equity must do equity, and such credit should be given even when not called for by the pleading.

4. **QUANTUM MERUIT: Building Contract: Two Classes of Cases: Measure of Contractor's Recovery.**

*Held*, by GRAVES, C. J., with whom BLAIR and WILLIAMS, JJ., concur, FARIS, J., concurring in the result, that in Missouri there are two classes of cases in *quantum meruit* growing out

of violated building contracts:   (1) cases where the contractor has breached his contract, and the owner has taken over and used the material and labor furnished by the contractor, and (2) cases where the owner has breached the contract, and the contractor has elected to sue in *quantum meruit* rather than upon the contract.   In the first, where the contractor breached the contract, in a suit in *quantum meruit* for material and labor his recovery is so limited as to keep the entire cost of the building within the contract price;   in the second, where the owner breaches the contract, the contractor may elect to sue in *quantum meruit*, rather than on the contract for damages, and if he does the owner cannot limit his recovery by the terms of the contract, because he himself has breached it.

*Held*, further, that if the owner has breached the building contract, the contractor suing in *quantum merwit* may recover the reasonable value of the work done by him regardless of what the contract price was, and even though the reasonable value exceeds the amount paid by him to sub-contractors for work done by them.   So that where a sub-contractor contracted to do the excavation work for $2700 and was paid that amount by the contractor, but the evidence established that the reasonable value of said work was $3275, the contractor, subsequently suing in *quantum meruit*, is entitled to recover $3275, and cannot be limited to the contract price of $2700.

*Held*, by BOND, J., dissenting, with whom WALKER and WOODSON, JJ., concur, that the only damage sustained by the contractor who has been prevented by the owner from completing the building is the loss of the bargain, and to permit him any greater recovery would be awarding damages as a punishment rather than as a compensation, and *quantum meruit* ought not to be used as a guise for recovering punitive damages.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

Affirmed.

*Kinealy & Kinealy* for appellant.

(1)   Even if defendant's counterclaim be disregarded entirely, it was gross error to give plaintiff a judgment when, with all liabilities paid, he had in his pocket more than he would have made, had he completed the contract.   Drainage Dist. v. Surety Co., 252 Mo. 565; Moore v. Gauss & Sons Mfg. Co., 113 Mo. 98;

274 Sup.—27.

Harrison v. Franklin, 126 Mo. App. 366; Mitchell Pl. M. Co. v. Allison, 138 Mo. 50; Bean v. Miller, 69 Mo. 384; Berthold v. Elect. Con. Co., 165 Mo. 280; Lazar Mfg. Co. v. Pelligreen C. & I. Co., 179 Mo. App. 447; Halpin v. Monny, 57 Mo. App. 59. (2) And if plaintiff were entitled to a judgment it was error: (a) To fix the reasonable value of the work regardless of his contract, sub-contracts, and monthly estimates, which latter were sworn to by him as being the reasonable value of the work. Steele v. Railroad, 265 Mo. 97; Shirts v. Overjohn, 60 Mo. 305. (b) To refuse to charge him with amounts which defendant paid to sub-contractors for work done on the building. (3) It was error to render judgment in favor of plaintiff and against defendant on its counterclaim, because: (a) The ground alleged by plaintiff for attempting to rescind the contract, non-payment of the May estimate, did not justify his abandonment of the work and suing on the theory that he was prevented from performing the contract. Laswell v. Handle Co., 147 Mo. App. 497; Fitzgerald v. Haywood, 50 Mo. 516; Puckett v. Nat. Ann. Assn., 134 Mo. App. 501; Turner v. Mellier, 59 Mo. 526; Coal Co. v. Freund P. & M. Co., 138 Mo. App. 274; Daley v. Carthage, 143 Mo. App. 564. And he is restricted to the reasons he assigned at the time. Railway v. McCarthy, 96 U. S. 258; Goodman v. Purnell, 109 C. C. A. 408; McDonald v. Hooker, 57 Ark. 638; Davis v. Dix, 64 Fed. 411; Ins. Co. v. Burman, 141 Fed. 842; Gibson v. Brown, 214 Ill. 341; Railroad v. Seitz, 214 Ill. 356; Farmers M. Co. v. Ins. Co., 127 Iowa 318; Sandefur v. Hines, 69 Kan. 171; Wallace v. Minn. Ele. Co., 37 Minn. 465; Frenzer v. Dufrene, 58 Neb. 436; Wyatt v. Henderson, 31 Ore. 55; Harris v. Chipman, 9 Utah, 105; Wright v. Land Co., 100 Wis. 269. (b) There being unpaid lienable claims against the building, defendant had the right under the contract to withhold payment of the estimate. Casey v. Gunn, 29 Mo. App. 14; Dempsey v. Schawacker, 140 Mo. 680. (c) The architect being made the arbiter

by the contract and having decided that plaintiff violated the contract and specifications that decision is binding on him. Williams v. Railway, 112 Mo. 463, 153 Mo. 487; Thompson v. St. Charles Co., 227 Mo. 220. (d) The weight of the evidence is that plaintiff did not live up to the specifications (e) The architect did not consent to a deviation from the specifications and had no power to do so. 6 Cyc. 29, tit. Builders & Architects; 2 Am. & Eng. Ency. Law (2 Ed.), p. 820; Flesh v. Christopher, 11 Mo. App. 483; Fitzgerald v. Moran, 141 N. J. 149; Adlers v. Muldoon, 45 Ill. 193; Salisbury v. St. Charles, 154 Ill. App. 531; Bond v. Newark, 19 N. J. Eq. 376; Glacius v. Black, 50 N. Y. 145. (f) There was no waiver or estoppel on the part of the architect because he had no knowledge of the faulty mortar until he made the final examination. Actual knowledge is necessary for estoppel or waiver. Tennent v. Ins. Co., 133 Mo. App. 345; Johnson Co. v. Lowe, 72 Mo. 637; Mantel Co. v. Thaler, 133 Mo. App. 86; St. Joseph v. Dillon, 61 Mo. App. 317; Lack v. Brecht, 166 Mo. 242. (g) The contract specifically provides that the architect may condemn material "worked or unworked" and that the contractor will "take down" all work condemned by the architect. Plaintiff cannot be heard to say the contract is too hard. Railway v. Stone Company, 90 Mo. App. 171. (4) Defendant on its counterclaim is entitled to recover all the damage it has suffered and expenses it has been put to growing out of plaintiff's breach of his contract. 13 Cyc. 156, tit. Damages; Norman v. Vandenberg, 157 Mo. App. 488. This includes damages for delay in completion at the rate contracted for. Dengler v. Auer, Mo. App. 548; Cochran v. Railway, 113 Mo. 359; Thompson v. St. Charles County, 227 Mo. 220. Attorney's fees and expenses of litigation are also proper items of damages. Dempsey v. Schawacker, 140 Mo. 689; State ex rel. v. Tittman, 134 Mo. 162; Coleman v. Clark, 80 Mo. App. 339; Hazlett v. Woodruff, 150 Mo. 534. (5) Although this court has re-

cently decided (St. Louis v. Parker-Washington Co., 196 S. W. 767) that, in actions at law compulsorily referred, this court will not review the findings of fact by the trial court if those findings are supported by substantial evidence and that court has not abused its discretion. that principle does not apply here, because: (a) The reply attacks the decision and certificate of the architect because of alleged fraudulent conduct on his part, and prays that his decision and certificate be set aside and for naught held. The whole action has thereby been converted into an equitable proceeding in which this court makes its own finding of the facts. Edwardson v. Garnhart, 56 Mo. 81; Williams v. Railway, 153 Mo. 495; Vandagrift v. Masonic Home, 242 Mo. 154; Sonnenfeld v. Rosenthal, 247 Mo. 250; Reed v. Young, 248 Mo. 613; State ex. inf. v. Lumber Co., 260 Mo. 274. (b) The court did not exercise a reasonable discretion in rendering the judgment in this case. Such facts as it did find were found against the great preponderance of the evidence, it ignored controlling admissions and facts, and it evidently misconstrued the contract between the parties.

*S. C. Taylor* for respondent.

(1) The findings of the referee stand before the appellate court in the nature of a special verdict, and if they are supported by substantial evidence the court will not disturb the same. Ferry Co. v. Railroad Co., 73 Mo. 419; Berthold v. O'Hara, 121 Mo. 97; Bank v. Donnell, 172 Mo. 402; State ex rel. v. Fidelity Co., 236 Mo. 375. (2) Failure on the part of an owner to pay an installment due under the terms of the contract, the unwarranted and illegal condemnation of a large portion of the work on the building which had been constructed according to plans and specifications, and the refusal of the owner to permit the contractor to proceed with the work constitute a breach of the contract and authorize the builder to rescind the same. Little v. Mercer, 9 Mo. 218; Bean v. Miller, 69 Mo.

384; Berthold v. Construction Co., 165 Mo. 303; American Co. v. Butler, 165 Cal. 497; Scheible v. Klein, 89 Mich. 376; Harton v. Hildebrand, 230 Pa. 335; Canal Co. v. Gordon, 73 U. S. 561; Construction Co. v. Seymour, 91 U. S. 646. (3) When an owner is guilty of a breach of the building contract after a part of the work has been done and before it is entirely completed, the contractor may rescind the contract and sue for the reasonable value of the work and labor performed and materials furnished by him under the contract, and his recovery is not limited to a *pro rata* part of the contract price. McCullough v. Baker, 47 Mo. 401; Ehrlich v. Ins. Co., 88 Mo. 249; Ahern v. Boyce, 19 Mo. App. 552; Kelly v. Rowane, 33 Mo. App. 440; Smith v. Keith, 36 Mo. App. 567; Dempsey v. Lawson, 76 Mo. App. 522; Cann v. Rector, 111 Mo. App. 164; Motor Car Co. v. Kast, 171 Mo. App. 309; United States v. Behan, 110 U. S. 338; Connell v. Higgins, 170 Cal. 541; Adams v. Burbank, 103 Cal. 646; Cochran v. Balfe, 12 Colo. App. 75; Waitkus v. Olszewski, 189 Ill. App. 332; Waggeman v. Janssen, 74 Ill. App. 38; Folkner v. Purl, 1 Ind. 489; Powers v. Hogan, 12 Daily (N. Y.) 444; North v. Hovey, 26 Vt. 109. (4) Where an architect abdicates his office of arbiter between parties to a contract and acts in collusion with one of the parties and is manifestly unjust, unfair and oppressive his decisions are not binding upon the other party. Lime Co. v. Shores, 105 Wis. 122; Elevator Co. v. Clark, 80 Fed. 705.

GRAVES, C. J.—Plaintiff, a contractor and builder, sues the defendant in *quantum meruit,* for the reasonable value of labor and materials furnished in the construction of a three-story brick building in the city of St. Louis. The petition states a simple action in *quantum meruit.* In the petition is a full itemized statement of account between the parties, showing the items of labor and materials furnished, and the payments made to plaintiff by the defendant. Such petition asks judgment for the balance of $12,920.68, with

interest thereon from June 9, 1911, and that the plaintiff have adjudged a mechanic's lien on the house and lot involved therein. The petition avers the statutory steps for this statutory lien.

To this petition the defendant filed answer and counterclaim. The answer is (1) a general denial, with which is coupled an admission that defendant did contract with plaintiff to furnish the labor and material for its building and that plaintiff did certain work thereupon, and (2) a plea of payment. These two portions of the answer are in fact a general denial and a plea of payment.

The defendant then pleads a written contract with plaintiff, detailing with particularity many of the provisions thereof. The answer then avers that the plaintiff breached the contract (stating particulars) and that by reason of the breach of the contract by plaintiff the defendant had been damaged in the sum of $5908, for which defendant asked judgment against plaintiff. With the exception of (1) the general denial and (2) the plea of payment, supra, each paragraph of the answer is bottomed upon a breach of the contract by plaintiff.

The reply admitted the execution of the written contract, and admitted that the terms thereof were as pleaded by defendant, but averred that defendant had breached the contract. The particulars of both answer and reply can be best dealt with in the course of the opinion. This outline suffices to show the character of the issues.

The trial court sent the case to a referee who took the testimony, made findings upon the issues of fact, and recommended that judgment go for the plaintiff in the sum of $7442.75, with interest at six per cent from June 1, 1911. Upon a review of the referee's findings, the court concluded that the referee had erred in two instances—one in the sum of $200 and another in the sum of $1425.14—and such court deducted these sums from the amount of the judgment recommended

by the referee; and otherwise approved the findings of the referee, and directed judgment for plaintiff in the sum of $5818.31, with interest, at six per cent, from June 1, 1911, to date of judgment. Judgment was entered accordingly.

The court also entered judgment against the defendant on the counterclaim, so that the defendant not only lost its counterclaim for $5908, but lost its claim of payment, and had a judgment against it for over $6000, including the interest. These details we give to show our jurisdiction on this, the defendant's appeal.

I.   Every issue in this case is an issue at law and not in equity. It is true that there is a long account

Reference:
Long Account:
Law Action
or Equity
Suit: Review
of Statutes.

involved, such as would make the case one for compulsory reference, and the case was properly referred. The parties did not object to the reference, but objections would have been unavailing, because as said, the character of the account is such as authorized a compulsory reference.

It has been urged that long and intricate accounts are subjects of equity cognizance, and that cases to that effect may be found I have no doubt. But the question is, how have long and intricate accounts, in cases otherwise purely cases at law, been recognized in this State? Have long and intricate accounts been classed in equity or at law? We say at law, and not in equity.

To start with, it required no statute to authorize a reference in equity. This was one of the powers of a court of equity, and such courts had the power to either appoint a master for a term, or a special master in the particular case. [16 Cyc. 429 et seq.] If the mere fact of there being a long and intricate account involved threw the case in equity, then the chancery courts could have the accounting taken before their master or commissioner, and no reference statute was necessary in such case. Our law-makers did not so view the matter. From the earliest legislation down

to the present, we have viewed long and intricate accounts (there being no other matters of equitable cognizance in the case) as issues at law, and not as issues in equity. The very best evidence of our views of the matter is found in the fact that we concluded it to be necessary to pass a law for compulsory reference. No law was necessary if the long and intricate account of itself threw the case into equity. But a tracing of our reference laws shows that by law we have always placed accounts of this character on the law side of our jurisprudence, and not upon the equity side. This matter we take up presently.

In this case able counsel for appellant asks us to review the rule announced in St. Louis to use v. Parker-Washington Co., 271 Mo. 229. It might be well to restate that rule before tracing the history and development of our reference statutes. The Parker-Washington Company case simply holds that in a case of compulsory reference, where the issues involved are issues purely at law, and where the trial court has approved the findings of fact made by the referee, such findings, so approved, will not be disturbed by this court, if there is substantial evidence to support such findings. In other words, that this court, in such case, will not review the evidence to determine its weight, but will only review the evidence to determine the fact as to whether or not there is substantial evidence to support the findings. Such findings in such a case stand here upon the same plane as the verdict of a jury in a law case, or as the findings of a court in a law case where no jury has been called. Such is the rule of the Parker-Washington Company case, and such rule is fully sustained by the history of our reference laws, as well as by the well considered case law of the State.

It has been suggested that our original statute as to references is found in the Laws of 1848-9 at page 91. To this I do not agree. Long before that we had reference statutes, and long before that, long accounts, in cases that were otherwise cases at law, were placed

and classed as issues of law. But let us get the facts from the books.

In Laws of Missouri of 1825, vol. 2, it will be seen that we had two Practice Acts. From page 620 to 636 of said Volume 2 is the Practice Act for cases at law. It is made up of two chapters and is headed, "Practice At Law." Following this, at pages 636 to 648, is the law governing practice in chancery cases. This is a single act of fifty sections, and is entitled, "Practice in Chancery." These two separate Practice Acts continued until the Act of 1848-9. Now, bearing in mind the two distinct acts, one for law matters and one for chancery matters, let us trace the real origin of our reference law. Section 35 of Chapter 2 of the Act entitled "Practice at Law," Laws of Missouri (1825), vol. 2, p. 630, is a reference statute. It provides that "if neither party requires a jury, the law and the facts may be determined by the court, or the court may *refer* such cause to three or more indifferent and competent persons, whose report, if approved by the court, shall have the *same effect as a verdict by a jury.*" This was our first reference statute. Note the force and effect given to the report of the referees, when approved by the court—"the same effect as a verdict by a jury." Such was the holding in St. Louis v. Parker-Washington Co., 271 Mo. l. c. 241.

But further, in Laws of Missouri (1825), vol. 1 p. 138, under the head of "Arbitrations," we have in Section 4 of that act a reference statute pure and simple. This section provides for a consent reference; whereas, Section 35, p. 630, vol. 2, Laws of Missouri, was not a consent reference. Under this Section 35, if the parties waived a jury, the case was triable by the court or by a referee at the option of the court, and not the option or consent of the parties. In other words, once a jury waived, the reference was compulsory, and the findings of the referee, when approved by the court, stood as the verdict of a jury. Thus the origin of references in Missouri, and they had their

place only in actions at law. This was true because in chancery cases there was no need for a referee. The court had its master in chancery, to whom could be referred all matters, including the taking of an accounting, if such was necessary in the cause pending in chancery.

Now, when we reach the Statutes of 1835, the matter is made more explicit. In the Missouri Statutes of 1835, the circuit courts, by express provisions of Constitution and law, exercised both law and equity jurisdiction. [R. S. 1835, p. 32 and page 155.] In equity they proceeded according to the rules, usages and practice of courts of equity. Then there was a distinct act of six chapters governing the "Practice in Chancery." [See R. S. 1835, pp. 506 to 517.] In the Statutes of 1835, at page 450, will be found the Practice Act (in seven chapters) governing courts of law. It is entitled, "Practice at Law." Section 15 of Article 4 of this Act (R. S. 1835, p. 463) reads:

"All issues of fact joined in any suit, in any court of record, shall be tried either by the court, by a jury, or by referees:

"First, The trial shall be by the court, when neither party shall demand a trial by jury, and the cause is not referred.

"Second, It shall be by jury, when either party shall demand such trial and the cause is not referred.

"Third, It shall be by referees, when the court is authorized to refer the trial, and shall have referred it accordingly."

This provision has reference to actions at law, pure and simple. Now, when we turn to Section 17 of article 5 of the same laws (R. S. 1835, p. 467) we will see just when the case may be referred. This Section 17 reads:

"Whenever an action shall be at issue in any court of record, such court may with the consent of the parties thereto, in its discretion, order such cause to be referred to one or three impartial and competent men; and when it shall appear to the court, *that the trial of*

*such action will require the examination of a long account on either side, such court may, without such consent, make the same order of reference."*

Here we have the consent reference and the compulsory reference, just as we had in Statutes of 1825, but in one section rather than in two. Here we have long accounts as the basis of a compulsory reference, but it must be borne in mind that it is long accounts in law actions and not in cases in equity. So far references are purely in law cases, and a referee an arm of a court at law and not a court of equity.

By Section 17, supra, we have the authority for an order of reference. The proceedings of the referee will be found on page 74 of Statutes of 1835. Section 26 on that page says: "The referees appointed in pursuance of any order of reference, shall proceed, with diligence, to hear and determine the matter in controversy." Other sections provide how they shall proceed, and finally Section 32 (p. 74, Statutes of 1835) fixes the force and effect of the findings in this language: "If the report of the referees be confirmed by the court, judgment shall be rendered thereon, in the same manner, and with like effect, *as upon the verdict of a jury."*

Is there any resemblance here to the rule in Parker-Washington Company case?

But let us get the distinction clear. Up to this time in our legal history referees are referred to only in cases at law. In the chancery court we had a commissioner, not a referee. [Statutes of 1835, p. 512.: Statutes of 1825, vol. 2, p. 641, sec. 28.] Throughout the two were separate. In equity, commissioners; at law, referees. Long and intricate accounts are placed under the head of law actions and not chancery actions.

Passing now to the Statutes of 1845, let us see the status. Here we have two Practice Acts, as in 1825 and 1835. "Practice in Chancery," an act of six chapters, Statutes of 1845, pp. 835 to 853, and "Practice at Law," an act of seven chapters, pp. 804 to 835. Under "Practice in Chancery," the court appointed

a commissioner, [Statutes 1845, p. 845, section 1, article 4.]    Under "Practice at Law." the court appointed a referee or referees.  [Secs. 23 and 24, Art. 5, of Practice Act, Statutes of 1845, p. 825.]    These two sections authorize a court at law to make an order of reference. Section 23 relates to consent references, but Section 24 is the one in point here, and it reads:

"When it shall appear to the court, that the trial of such action will require the examination of a long account on either side, such court may, without such consent, make the same order of reference."

Then under Section 20 of Article 4, "Practice at Law" act, Statutes of 1845, p. 819, we have this:

"All issues of fact joined in any suit, in any court of record, shall be tried, either by the court, by a jury, or by referees:  First, The trial shall be by the court, when neither party shall demand a trial by jury, and the cause is not referred;  Second, It shall be by jury, when either party shall demand such trial, and the cause is not referred;  Third, It shall be by referees, when the court is authorized to refer the trial, and shall have referred it accordingly."

Then, as in 1835, we have a section of law prescribing the duties and procedure of referees.  Thus Section 27, p. 126, Statute of 1845, reads:

"The referees appointed in pursuance of any order of reference, shall proceed with diligence to hear and determine the matter in controversy."

Then, by Section 33, on said page 126, supra, we have the force of their findings, thus:

"If the report of the referees be confirmed by the court, judgment shall be rendered thereon, in the same manner and with like effect, *as upon a verdict of a jury.*"

So throughout references have been arms of courts at law, and not of courts in equity.  Throughout their findings have been as verdicts of juries, and throughout long accounts have been the subjects of references in courts of law.  And throughout there has thus far been

a clear distinction between a commissioner in chancery and a referee in a law case.

But we are cited to the Act of 1848-9, p. 91, as authority for the position, that a long account which is referred takes the cause into equity rather than at law, as it had gone prior to this act. By this Act of 1848-9 (Laws 1848-9, p. 73) we reformed our practice acts. Distinctions between law and equity were abolished, and provision made for "but one form of action for the enforcement or protection of private rights, and the redress or prevention of private wrongs, which shall be denominated a civil action." We fully understand this act. But it is hardly necessary to say (in view of repeated rulings) that under this act if the things stated in the petition were of the kind theretofore heard by courts of law, such petition would be heard on the law side of the court and as a case at law. On the other hand, if the petition counted in what had theretofore been cognizable in chancery, such petition would be heard on the equity side of the court, and as a cause in chancery. In other words, this act did not make what was theretofore cognizable in law cognizable in equity, or *vice versa*. We have seen that long accounts were theretofore cognizable in law and not in equity. In other words, heard before a referee, the arm of a court at law, and not before a commissioner, the arm of a chancery court. Don't understand me to say that a commissioner in chancery could not take an accounting, for he could, if the cause was for other grounds in chancery. What I do mean is that in this State a very long or intricate account did not place a case in chancery on that ground alone, but on the contrary the law provided a referee, an arm of a court at law, to take such an accounting.

Section 5 of Article 16 of the Practice Act of 1848-9, p. 91, is urged as authority for the claim that the cause was transferred to equity, but this overlooks Section 4 just above it, which specifically authorizes the appointment of a referee. When it is considered that

the act was dealing with both classes of cases (those theretofore cognizable at law, and those theretofore cognizable in equity) it can easily be seen how two provisions were made when one might have answered. But we shall not burden this opinion with Section 5, so much relied upon as the basis of the claim that we must review the facts as in equity. It was of short life. It blossomed in the morning and died with the setting of the sun. It hardly made a ripple on the flowing stream.

Passing now from the Statutes of 1845 to the Statutes of 1855, and passing in dignified and quiet respect over the dead and mouldering body of the said Section 5, p. 91, Laws of 1848-9, let's see the continued status of the law as to the referees. Section 12 of Article 10, Statutes of 1855, vol. 2, p. 1261, reads:

"An issue of fact in an action for the recovery of money only, or of specific real or personal property, must be tried by a jury, unless a jury trial be waived, *or a reference ordered, as hereinafter provided.*

Note the fact that these are all actions at law. The "hereinafter provided" is found in Sections 17, 18 and 19, following. Section 17 refers to reference by consent. Section 18, so far as pertinent, reads:

"Where the parties do not so consent, the court may, upon the application of either, or of its own motion, direct a reference in the following cases: First, Where the trial of an issue of fact shall require the examination of a long account on either side, in which case the referees may be directed to hear and decide the whole issue, or to report upon any specific question of fact involved therein."

We have above the character of cases in which the reference may be ordered. They are cases at law and cases with long accounts. Now as to the effect of the findings we have to turn to another statute, which deals with the subject.

Section 27 of Chapter 7 (Statutes of 1855, vol. I, p. 199) reads: "The referee or referees, appointed in

pursuance of any order of reference, shall proceed with diligence to hear and determine the matter in controversy.''

Section 42 of the same chapter reads: ''If exceptions are allowed, the matter may again be referred, with instructions, if necessary; but, if the report is confirmed by the court, judgment shall be rendered thereon, in the same manner and with *like effect as upon a special verdict.*''

These laws remained intact in the General Statutes of 1865. [Vide Sections 12, 17, 18 and 19, Chapter 169, General Statutes 1865, pp. 673 and 674.]

So, too, Section 27, Chapter 198, General Statutes of 1865, p. 773, provides that the referees shall proceed with diligence; and Section 42 on page 775 provides:

''If exceptions are allowed, the matter may be again referred, with instructions, if necessary; but, if the report is confirmed by the court, judgment shall be rendered thereon, in the same manner and with *like effect as upon a special verdict.*''

Going now to the Revised Statutes of 1879 (which are after the adoption of our present Constitution), we find Section 3600, which reads as follows:

''An issue of fact in an action for the recovery of money only, or of specific real or personal property, must be tried by a jury, unless a jury trial be waived, or a *reference ordered, as hereinafter provided.*''

Note the trial shall be by jury, unless it be waived, or unless a reference is ordered ''as hereinafter provided.'' This ''hereinafter provided'' is found in Sections 3605 and 3606, following. They read:

''Sec. 3605. All or any of the issues of fact in the action may be referred, upon the written consent of the parties.

''Sec. 3606. Where the parties do not so consent, the court may, upon the application of either, or of its own motion, direct a reference in the following cases: First, where the trial of an issue of fact shall require the examination of a long account on either side, in

which case the referees may be directed to hear and decide the whole issue, or to report upon any specific question of fact involved therein.''

There is no common construction which would allow us to say that the phrase ''or a reference ordered, as hereinafter provided'' has reference to Section 3605 only. It clearly refers to both sections, 3605 and 3606. The law starts out with pure law cases in Section 3600, and the reference referred to is specifically in such cases. The next section (Sec. 3601) refers to equity cases, and it says the issues in such cases may be tried by the court, or the court ''may refer it, as hereinafter provided.'' So that both law and equity cases may be referred ''as hereinafter provided.'' That is to say, they may be referred by consent, or they may be referred (in proper conditions) by compulsion.

Section 3623, Revised Statutes of 1879, reads:

''If exceptions are allowed, the matter may again be referred, with instructions, if necessary; but if the report is confirmed by the court, judgment shall be rendered thereon, in the same manner and with *like effect as upon a special verdict.*''

A special verdict is defined by statute. [Sec. 1988, R. S. 1909.] It has likewise been construed by this court. [Shipp v. Snyder, 121 Mo. l. c. 161.] A reading of these may obviate some loose thought recently expressed in this case.

These several sections, supra, run through all of our statutes down to 1909. They are in exactly the same terms. Section 3600 of the Revised Statutes of 1879 is Section 1968 of the Revised Statutes of 1909; Section 3601 of 1879 is Section 1969 of 1909; Section 3605 of 1879 is Section 1995 of 1909; Section 3606 of 1879 is Section 1996 of 1909; and Section 3623 of 1879 is Section 2013 of 1909.

The trouble with our case law is that we have tried, in some cases, and without either rhyme or reason, to limit the phrase ''or a reference ordered as hereinafter provided'' in Section 1968, Revised Statutes 1909, to

the consent references mentioned in Section 1995, rather than to give them their full meaning as referring to all references thereinafter named. When the law is traced as I have done, and the relative position of these several sections in the divers statutes is considered, it is easy to discover wherein trouble may have arisen.

Throughout, long and intricate accounts in law cases have been made the subjects of reference, rather than a jury trial; throughout, accounts of this character have not been, by our statutes, recognized as equitable, or as the means of throwing cases into equity. Throughout, the findings of the referee, if approved by the court, has had the effect of a special verdict.

When the divers sections are read together (R. S. 1909, secs. 1968, 1969, 1995, 1996 and 2013) it cannot be said that it is only in consent references that the findings of the referee, when approved by the court, shall have the effect of a special verdict. Said Section 2013 has in view all references.

It is true that there is a footnote on page 199, Revised Statutes 1855, which says that the reference statutes in the Statutes of 1855, on said page 199 and following, were taken from article 4 of the Chancery Code of 1845, and we are cited to this footnote for authority. Writers of footnotes are not always accurate, and this footnote is not sustained by the facts. We bespeak a careful examination of the facts. To begin with, Article 4 of the Chancery Code of 1845 (R. S. 1845, p. 845) had but fourteen short sections, all relative to commissioners in chancery, whilst the reference laws of 1855 (Revised Statutes 1855, p. 199, et seq.) has twenty elaborate sections, some of them quite elaborate, thus showing a re-writing of the law—in other words a new statute. But this is not all. We shall point to the places from which most of the sections of the Statutes of 1855 came. Turning to page 199 of Revised Statutes 1855, under the head of "References" the first section is 27 and we find this section an exact rescript of Section 27, Chapter 9, Revised Statutes of

274 Sup.—28.

1845, page 126, and is not in the Chancery Code of 1845 at all. The Chancery Code is Chapter 137 of Revised Statutes of 1845, pages 835 to 853. Section 28, page 199, Revised Statutes of 1855, is new. It is not found in Chancery Practice of 1845. Section 29 is likewise new.

Section 30, page 199, Revised Statutes of 1855, is an exact rescript of Section 29, Chapter 9, Revised Statutes of 1845, page 126. Section 31, page 199, Revised Statutes of 1855, is a practical rescript of Section 28, Revised Statutes of 1845, page 126. Section 32, page 199, Revised Statutes of 1855, comes from Section 30, p. 126, and Section 4, p. 122, of Revised Statutes of 1845, and not from the Chancery Act of 1845. Section 33, p. 200, Revised Statutes of 1855 (pertaining to the using of depositions before referees) is a new section in the reference law. There was a section of similar import in the Chancery Act, but not in the same language. Section 34, page 200, Revised Statutes of 1855, is practically a rescript of Section 31, Chapter 9, page 126, Revised Statutes of 1845. Section 35, page 200, Revised Statutes of 1855, is an exact rescript of Section 32, Chapter 9, page 126, Revised Statutes of 1845. Section 36, page 200, Revised Statutes of 1855, is a new section, and is in neither the previous Reference Statutes, nor the Chancery Practice. So likewise are Sections 37 and 38. Section 39, page 200, Revised Statutes 1855, is taken from the Chancery Practice of 1845, and is a rescript of Section 9 of Article 4 of that act, substituting the words "referees" for "commissioners." The section relates only to the saving of exceptions to the competency of witnesses. Section 40, page 201, Revised Statutes of 1855, is new. Section 41, page 201, Revised Statutes of 1855 (pertaining to time when exceptions to report of referees shall be filed), is a practical rescript of Section 11, Article 4, of the Chancery Act of 1845, substituting the word "referees" for "commissioners." Section 42, page 201 of 1855, is a practical rescript of Section 33, Chapter 9,

page 126, Revised Statutes of 1845. Sections 43 and 44, page 201, Revised Statutes of 1855 (pertaining to how notices and subpoenas issued by referees may be served), are new, but there were similar provisions in the Chancery Code. So that it will be seen that every substantial section of the Revised Statutes of 1855 have come from the reference laws of 1845, and not from the Chancery Practice of 1845. Only three insignificant sections out of the twenty came from the Chancery Practice Act of 1845. How the writer of the footnote got such an idea is beyond comprehension. We ask pardon for this long review of the reference laws of 1855, but the reliance placed on this erroneous footnote required it. So that we again repeat that in references, if the case is one at law (and long accounts have always been at law) the findings of the referee stand as special verdicts of a jury, when they have been approved by the trial court. The trial court can cut out items which have no support in the evidence. Verdicts may be set aside when not supported by evidence. But this court will not and should not weigh the evidence, where the evidence conflicts, anymore than it would weigh the evidence on the verdict of a jury where the evidence conflicts.

In all other cases at law, tried before a court, without the intervention of a jury, we say that we will not weigh the evidence to determine the correctness of the court's findings of fact. Such findings of fact, like verdicts of a jury, are binding here, if supported by substantial evidence. Why shouldn't such rule prevail in law cases, wherein a reference is compelled by reason of a long account? The history of reference statutes, and their sundry provisions, sustain the views expressed in the Parker-Washington Company case, supra. Sound reason is with the rule announced in that case, and the well considered case law of this and other states sustain it.

In the case at bar there is substantial evidence (and more) to sustain every finding of fact approved

by the court. In  such case this court is powerless to
disturb the findings of fact, and the judgment should
be affirmed.

II.   That the mere fact of there being a long and
intricate account in an action, otherwise purely an ac-
tion at law, does not make such case a cause in equity,
is not only established by the history of the
law of reference, as above detailed, but it
has been so recognized by this court.   This
recognition has been in cases where the con-
stitutionality of the compulsory reference law has been
attacked.

Trial by
Jury: Law
Case.

We have held this compulsory reference statute
as not violative of the Constitution of 1875, and not
on the ground that a long and intricate account threw
the case into equity, but on the ground that our Con-
stitution only guarantees the right to trial by a jury
"as heretofore enjoyed."   We hold that long before
the adoption of the Constitution there was no right
to a trial by jury in law cases involving long and intri-
cate accounts, and for this reason the Constitution   was
not violated by our compulsory reference statute. [Wentz-
ville Tobacco Co. v. Walker, 123 Mo. 662; Ice Co. v.
Tamm, 138 Mo. 385; Tinsley v. Kemery, 170 Mo. 310.]
These cases cite and discuss a great number of cases.
The effect of all is that a long and intricate account
does not change an otherwise law case into an equity
case, but that such cases still remain cases at law,
and a trial by jury cannot be had therein by the man-
date of the Constitution, because such cases had not
been tried by jury prior to the adoption of the Constitu-
tion.   So that with the doctrine of the Parker-Washing-
ton Company case, and the cases therein cited, we are
still satisfied.   And why not?   Why say if a court tries
a negligence case, or any other case at law, and finds a
judgment in the sum of $10,000 and that case comes here
upon appeal, we cannot disturb the findings of fact,
and yet say in a reference, in a pure law action, we

will search the whole record to see whether or not the
weight of the evidence shows that a little mortar came
up to contract requirements, or that $50 worth of glass
was single or double thickness? The history of reference
laws and their specific provisions contemplate no such
thing. If long accounts made equity cases of them, then
there was no need in all this legislation as to compulsory
reference. Chancery courts, even at common law, could
refer to their master any questions involved in the
controversy. References in common law actions were
unknown, and hence the necessity of these statutes.

Nor is there substance in the contention that long
accounts in law actions prior to the Constitution of
1875, should have been heard before a jury under the
prior constitutions, and therefore under the Constitu-
tion of 1875 they should now be so heard. In 1851,
in Shepard v. Bank, 15 Mo. l. c. 150, the validity of the
compulsory reference statute was challenged on con-
stitutional grounds. It was urged that it trenched upon
the constitutional right to trial by jury. This court up-
held the statute. So that for years prior to the adoption
of the present Constitution no trial by jury in law
cases involving long accounts had been permitted or
enjoyed. This under the express ruling of this court in
Shepard's case, supra. Our present Constitution only
gives the right to trial by jury "as heretofore enjoyed."
The right to a jury in law cases involving long ccounts
had not been "heretofore enjoyed" when our present
Constitution was adopted, and hence trial by jury in
such cases was not preserved in this Constitution.

For the sake of the argument we might admit that
this court was wrong in Shepard's case, and that law
cases having long accounts should have been triable
before a jury and not a referee. But they were not so
tried. Whether rightfully or wrongfully makes no
difference. Our present Constitution only guarantees
the right to jury trials where such right had been there-
tofore enjoyed. In law cases with long accounts, both
by statutes and the ruling of this court, the right to
trial by jury had been denied in such cases, and no such

right had been enjoyed for years before our present Constitution. The right is therefore excluded by the very terms of the present Constitution.

But as neither party demanded a jury or objected to the reference made, this question is not in this case.

III.   But even if we concede that it is the duty of this court to weigh the evidence, the evidence when weighed shows that defendant breached the contract, and practically the whole answer falls to the ground. I shall now proceed on the theory that it is our duty to

Breach of Contract: Legal Fraud of Arbiter.

review the evidence and make our findings. As to who breached the contract is a pivotal question in this case, because upon it depends the applicable law. The referee found that the defendant had breached the contract, and, of course, applied the law applicable to such case. It stands without contradiction that the defendant refused to pay $9000 due on June 1st. It is urged that there is no evidence of the fraudulent conduct of the architect, and there is quoted a line or two from the referee's report, but not a syllable from the evidence. That the real facts of this case may appear I am glad to go to the record, for they show overwhelmingly that both in character of material and quality of work plaintiff was living up to his contract, unless it be as to the character of the cement used under the following two clauses of the specifications: "The fire walls to be covered with wall coping laid in *Portland Cement,*" and "Last five courses of chimneys to be laid in Portland Cement mortar." These the subcontractor under plaintiff offered to make good prior to defendant's refusal to pay. But we are adrift from the thought in mind at the beginning of this paragraph. That thought was, who breached the contract?

In answering this question we shall not deal in glittering generalities, but in plain record facts. Article 9 of the contract, page 107 of the record, furnished by appellant, reads:

"It is hereby mutually agreed between the parties hereto that the sum to be paid by the owner to the contractor for said work and materials shall be $31,607, subject to additions and deductions as hereinbefore provided, and that such sum shall be paid by the owners to the contractor, in current funds, and only upon certificates of the architect, as follows, as per clause 21, page 7, of the specifications."

Now turning to the specifications referred to in article 9 of the contract, we find that it reads:

"21. 'Payments shall be made monthly (unless otherwise provided) for eighty-five per cent of all work and materials in place.

"Estimates for said work shall be approved by the architects from estimates submitted by the sub-contractors. Upon final completion and acceptance of the work all unpaid balances shall be liquidated within ten days."

As evidence of the fact that defective work or material was not to preclude these partial payments, we find paragraph 22 of the specifications reads:

"Monthly or partial payments, except the final payment, are not to be construed as conclusive evidence of the satisfactory performance of this work, either wholly or in part, and that no payment shall be considered or regarded as an acceptance of defective work or improper materials."

The referee makes this finding that is of value here:

"The defendant relies upon that provision of the contract making the architect the final judge on disputed questions arising during the progress of the building.

"Mr. Powers, the architect, testified very frankly when asked his reason for not issuing his certificate on the May estimate, as follows:

"Q. Didn't you tell Mr. Johnston (the contractor) that before you would issue a certificate you would have to talk with Mr. Dowling (the owner)? A. I make it a rule always to do that, Mr. Taylor.

"Q. Didn't you tell Mr. Johnston that you thought it was your duty to issue the certificate? Did you say

that to Johnston? A. It was my duty to issue it under the contract with this building.

"Q. Didn't you tell him it was your duty to issue the certificate at that time; that you wanted to do it? A. It was my duty under the contract to issue a certificate; whether I told him that at that time I don't know, but it was my duty under the contract to issue the certificate.

"Q. For the work done during the month of May? A. Yes, sir.

"Q. You told Johnston that fact, didn't you? A. No, I didn't tell Mr. Johnston that fact; I don't know that I did. It was my duty to issue it, wholly without regard to what I told him.

"Q. Didn't you tell him you would issue it, but that Mr. Dowling forbade you doing so? A. It might have been.

"Q. Don't you know? A. I don't know whether I did or not. If I told him that, it was because I thought it wouldn't be paid; when I issue a certificate, I want to know it is all right, and going to be paid, before I let it go out of my office.

"Q. Mr. Dowling told you not to issue it, didn't he? Yes, or no. A. No, I think Mr. Dowling told me that he wouldn't pay it.

"Q. Didn't he tell you that you shouldn't issue it because he would not pay it if you did? A. No, he told me he wouldn't pay it. Then I said, there is no use of my issuing it.

"Q. That is the reason you didn't issue it. A. I think that is the final reason.

"The architect testified to the same effect in his deposition on file, pages 29-31."

The abstract of the evidence made by appellant shows the facts as found by the referee. *Vide* page 163 appellant's abstract of record on file here. There it is said:

"The contract provides that eighty-five per cent shall be paid at the beginning of the month. For the work done previous to April, I issued a certificate

about April 2nd, for the amount less fifteen per cent, and for the month of April I issued a certificate, about the 4th or 5th of May, which was paid; I did not issue the certificate *which should have been issued* about June 1st. *It was my duty under the contract to issue the certificate* but I refused to do it, because I found it would not be paid. The amount it would have been issued for was approximately $9000. *There was no dispute as to the amount.* It is correctly stated in my deposition that I started the certificate and asked Dowling if he had the money convenient and that he asked me how much it was and later told me that he had decided not to pay it. I believe I found Mr. Johnston a perfectly straightforward man and if he was not he would have heard from me."

But this is not all. The evidence shows that when Mr. Johnston, the plaintiff, presented his estimate of work for the month of May, two items therein were objected to by the architect, Powers; that thereupon Johnston and Dowling (the president of defendant) met at Powers's office, and the three went over this estimate, and it was agreed that it should be reduced to $9000, instead of $9221.25, by reducing the plumbing estimate from $475 to $303.75, and insurance from $100 to $50. *Vide,* appellant's abstract of record, page 93. This is the testimony of Johnston, which is corroborated by the testimony of Powers, supra. But this is not the only corroboration. The defendant introduced in evidence this estimate of Johnston, which shows just what was done. Defendant's Exhibit No. 29, and the notes thereon on pages 126 and 127 of the appellant's abstract of record, read:

"St. Louis, May 31, 1911.
"Mr. H. W. Powers, Architect.
      City.
"Dear Sir:
      "The following is my estimate for work in place at the Star Bucket & Pump Co.'s building, 1220 N. Fifteenth St.:

"Excavating ........................$ 2700.00
Concrete, Masonry & Cut Stone ........ 2300.00
Iron Work ........................... 2000.00
Brick Work .......................... 5100.00
Lumber .............................. 3900.00
Carpenter Work ...................... 1700.00
Mill Work ........................... 700.00
Plumbing and sewering ............... 475.00
Sprinkling .......................... 1150.00
Steam Heating ....................... 1600.00
Sheet metal work .................... 100.00
Bond & Permits ...................... 200.00
Liability Insurance ................. 100.00

$22025.00

"Less 15% ........................... 3303.75

$18721.25
9500.00

"Balance ............................ $9221.25.

"Stenographer's note:

"The item 'Pluming & Sewering, $475.00;'" the amount '$475.00' is crossed out, and opposite same in lead pencil appears the amount '$303.75.'

"Also, the item 'Liability Insurance, $100.00;' the amount '100.00' is crossed out, and above same in lead pencil appears the amount '50.00.'

"Also, opposite the footing, '$22025.00' appears in lead pencil the amount '21803.75.'

"Also, the balance of '$9221.25' is crossed out, and underneath in lead pencil appears the amount '$9000.00.'

"Respectfully submitted,
"P. G. JOHNSTON & Co.,
"Per JOHNSTON."

This corroborates both Powers and Johnston as to the agreement upon $9000 for the May estimate. Dowling in his testimony claims that the agreement was

on an amount over $8000, but less than $9000. The amount is not very material, but it is material that a, certificate of allowance was due to plaintiff, and the architect would not issue it, and, it is material, as the evidence shows, that defendant's president said that it would not be paid, if issued.

It is urged that there is no evidence of fraudulent or wrongful conduct, upon the part of this architect, who by the contract was made the arbiter between plaintiff and defendant. Counsel contend, in order to find that plaintiff breached the contract, that the requirements of this arbiter were not met, and cites a number of letters passing between the parties, after the architect refused to issue this certificate due June 1st.

Under the contract it was the duty of Powers to issue the certificate of indebtedness on June 1st. Under the contract it was the defendant's duty to pay the same, but through its president it said that it would not pay. Powers, the arbiter, admits it was his duty to issue this certificate, which fixed the then liability, but says he refused because Dowling said that he would not pay it. This was no small sum, but practically one-third of the contract price. To say that this act of Powers was not tinctured with legal fraud and oppression, is to wipe out of this record the admissions of Powers, who was a witness for defendant, as well as the practically undisputed other evidence in the case. To illustrate: Suppose a circuit judge were trying a case; suppose, like the arbiter Powers in this matter, such judge had all the facts before him, and then spread of record that "under the facts judgment should go for plaintiff for $1000, but defendant says he will not pay such a judgment, therefore I find for the defendant." Would there be any legal fraud couched in that judgment? Does it take a lawyer to conclude that there would be?

In the case at bar, this architect "of high professional standing and experience," to use the language of another, on May 31st (note the date and see Dowling's testimony also for the date) had the parties

before him, and says that when they got through there was no dispute as to the amount for which he should issue a certificate, and further says that he should have issued it June 1st, but that he did not issue it solely because Dowling said he would not pay it. That plaintiff was entitled to the certificate, and through the certificate to the payment of $9000, he admits, and yet he refused to perform this plain legal duty. Yet it is said that this act of an arbiter which deprived the plaintiff of a right, does not rise to the dignity of fraud. It makes no difference whether the situation shows fraud in fact or fraud in law, the consequences are the same. If these facts do not show fraud, partiality and oppression upon the part of this arbiter, the definitions of these terms will have to be rewritten.

Now this agreement as to the amount of the May estimate was on May 31st. The certificate was due to plaintiff on June 1st. It was not issued because Dowling said he would not pay it. This was then the breach of the contract by defendant. Paragraph 22 of the specifications, supra, fully protected defendant from all defective material and work, if as a fact there was any such. The weight of the evidence shows that there was not. At least there was no excuse for this refusal to pay.

After this, on June 2nd (Abstract, p. 93), this arbiter suddenly finds that all the brick work on the second and third stories of this big building had not been done with the mortar called for by the contract, and writes a letter demanding that it all be torn down and rebuilt. It is at this point that counsel for defendant starts the case. We start with the refusal to pay. When this record is read there can be no question that the first breach of this contract was by the defendant.

IV. Nor is the above all in this record that tends to show fraudulent and wrongful conduct upon the part of this architect. Of course, he says that Dowling did not tell him to refuse to issue the certificate. Of course,

<span style="margin-left:2em">**Fraudulent Conduct of Architect.**</span> Dowling testifies that he did not tell Powers not to issue the certificate. Nor do highwaymen come into court and admit that they either jointly or severally committed the act. Fraud in fact is not usually proved by the direct admissions of the parties thereto, but usually by circumstances which overcome the express denials of fraudulent conduct. Let us see the surroundings of this case. When I say this, I mean, let us read the real record. Up to May 31st there had been no complaint about this work. This is the day, according to Dowling, that he was in the architect's office, when Johnston came in with the May estimate. This estimate was given to the architect and was put in evidence by defendant with the pencil changes thereon, which showed that the parties got together on the sum of $9000. This architect had been in the building from one and one-half to two hours each morning and evening (three to four hours each day) during the whole time. He saw the walls go up from foundation to the coping of the fire walls. The building was to the point of putting on the roof. Not a complaint had been made.

It would appear that after Dowling told Powers that he would not pay the certificate if issued, and on May 31st, Powers wrote a letter complaining about the mortar used in fire walls, chimneys, stack and pent house, and these changes could have been made for $40 to $50. Part of this the subcontractor offered to do without charge. This was the first step after the architect judicially determined not to issue the certificate because Dowling said that he would not pay it. The big stride was not taken until June 2nd, when the architect suddenly discovers that all the brick walls in the second and third stories of the building had not been placed with mortar in accordance with the contract, and he directed that this be remedied within three days. Don't forget at this point that this architect had been on this building three to four hours each day whilst these walls were going up. Don't forget that the men say he saw the mortar mixed, and he does not deny it. On the

6th, he concludes that $500 should be allowed the owner for this alleged defective mortar. Just a small bite of pie for his employer and paymaster. But this is not all. From pages 57 to 140 appears plaintiff's evidence in chief and 195 to 209 is plaintiff's rebuttal. From pages 140 to 194 is defendant's evidence and exhibits. Including the plaintiff 36 witnesses testified for the plaintiff. Many of them had worked on the building and others furnished materials. This evidence overwhelmingly shows a substantial compliance with the contract in every particular, and the ordering out of two stories of this building on the facts in this case was an arbitrary ruling by this architect and evidently made to force a rebate in contract price in favor of his employer and paymaster. The evidence for defendant consisted of two brick and mortar experts, two carpenters, Powers (the hired man of defendant), the counsel for defendant, and the three Dowlings, the officers of defendant. Don't forget these walls, second and third stories, built by plaintiff are in the building as afterward completed by defendant.

So viewing this case as one in chancery, I conclude (1) that the evidence clearly shows a breach of contract by defendant and (2) the fraudulent conduct of the architect.

V. With the breach of the contract upon defendant's part practically all of the things pleaded in its answer fall out of the case. Not only so, but the applicable law is thereby changed. If defendant breached the contract he can claim no payments to subcontractors (under his present pleadings), because even in equity we do not go beyond the pleadings for the issues. If the defendant chose to rest his whole defense upon a contract which both he and his architect deliberately breached, he is not in a very presentable shape for a court of conscience. The trial court allowed him some payments which that court

Pleading:
Quantum Meruit:
Contractor:
Recovery:
Contract Limits.

concluded had been made by direction of plaintiff. There was a plea of payment, and under this second clause of the answer, the court was right in charging those items against the plaintiff. This on the theory that payments directed by plaintiff were the same as payments to plaintiff. But this is as far as the court could have gone. When it appears that defendant breached the contract (as it does appear), then all of defendant's answer falls out of the case except the first two short paragraphs thereof, which contain (1) some admissions and a general denial, and (2) a plea of payment. All the remainder of the answer is bottomed upon the contract, which, upon defendant's proven breach, falls clear out of this, an action in *quantum meruit*.

But it is urged that plaintiff on the proof made would be recovering in excess of his contract. Defendant urges that the plaintiff procured the material and labor at a less price than the proof shows the reasonable value to be, and therefore should not be entitled to more than he paid out, in this action. To illustrate: Ryan contracted the excavation work at $2600, and then did $100 if extra work. He was paid $2700. He testified that the work he did was reasonably worth $3275, and that he lost $500 to $600 on the job. Other testimony is to like effect. This brings us to what is the measure of recovery in cases of this kind. In Missouri we have two classes of cases in *quantum meruit* growing out of violated building contracts: (1) cases where the contractor has breached his contract, and the owner has taken over and used the material and labor furnished by the contractor, and (2) where the owner has breached the contract, and the plaintiff has elected to sue in *quantum meruit* rather than upon the contract.

There has been some loose writing in the Missouri cases as to the measure of recovery in these two classes of cases, but in Division One I have set out what I now assert to be the true rule in a case where the owner has breached the contract. In the Division case, Bradley Heating Co. v. Sayman Realty and Investment

Co., 201 S. W. 864, 1. c. 866, I did not pass upon the question, because not necessarily involved therein, but I did collate the authorities stating what I deem the rule. In that case I said:

"Thus in McCullough v. Baker et al., 47 Mo. 1. c. 402-3, it is said: 'The suit is not founded upon the contract. The plaintiff waives that and sues upon the *quantum meruit.* If he is entitled to recover at all he is entitled to recover a reasonable compensation for the work actually done. That is the rule where the contractor is prevented from completing his job by the unwarranted acts and defaults of the other party. In such a case he is not restricted to a *pro rata* share of the contract price. He may either sue upon the contract and claim damages for a breach of it, or he may, as in this case, waive the contract and sue for the reasonable value of his work.'

"In Ehrlich v. Life Insurance Co., 88 Mo. 1. c. 257, BLACK, J., said: 'So a contractor who has been prevented from completing his job, may waive the action for damages and sue for the value of the work done and materials furnished, and he is not in such case restricted to a *pro rata* share of the contract price. [McCullough v. Baker, 47 Mo. 401; Mitchell v. Scott et al., 41 Mich. 108; Fitzgerald v. Allen et al., 128 Mass. 234.]'

"With a preciseness characteristic of the man, ROMBAUER, P. J., in Kelly v. Rowane, 33 Mo. App. 1. c. 443, thus summarizes the law:

" 'The law governing the rights of parties to building contracts in this State, although peculiar, is well settled. If a contractor is prevented by the unauthorized act of the owner from completing a building contract, he may recover in an action the reasonable value of his work and labor, regardless of the contract price, and is not restricted to a *pro-rata* share of the contract price. [McCullough v. Baker, 47 Mo. 401; Ahern v. Boyce, 19 Mo. App. 552.] On the other hand, if he voluntarily abandons the contract, he may recover the actual value of the work and ma-

terials, not exceeding the contract price, less such damages as have resulted to the other contracting party, from the breach of the contract. [Yeats v. Ballentine, 56 Mo. 530; Eyerman v. Mt. Sinai Cemetery Assn., 61 Mo. 489; Davis v. Brown, 67 Mo. 313.] Under the issues made by the informal pleadings of the parties, and the evidence adduced in support, the case in its nature was to be governed by one or the other of these propositions. If the plaintiff was prevented by the unauthorized act of the defendant his contract, his rights and extent of recovery were governed by the first class of cases above cited; if he voluntarily abandoned it, by the latter.'

"This rule is further recognized to the fullest in Eyerman v. Cemetery Assn., 61 Mo. 489; Davis v. Brown, 67 Mo. 313; Car Co. v. Kast, 171 Mo. App. l. c. 311-12; Cann v. Rector, etc., 111 Mo. App. l. c. 182; Dempsey v. Lawson, 76 Mo. App. l. c. 526; Smith v. Coal Co., 36 Mo. App. l. c. 580."

That we have cases which say the plaintiff (contractor) who has not breached his contract, suing in *quantum meruit* an owner who has breached his contract, cannot recover in excess of the contract rate, there is no doubt, but to my mind these cases overlook the real distinction. Where the contractor breached the contract, and then sues for material and labor in *quantum meruit*, it is proper to limit his recovery so as to keep the finished structure within the contract price. This, because his breach of the contract does not destroy the owner's rights under the contract. By breaching the contract he cannot take from the owner the rights reserved in the contract, but the owner in the *quantum meruit* action can at least assert the contract to the extent of fixing values and damages. The rule of a case where the contractor has breached the contract is well expressed in Eyerman v. Mt. Sinai Cemetery Association, 61 Mo. l. c. 491: "The established rule extracted and deduced from all the cases is, that where a party fails to perform his work according to the stipulations

274 Sup. 29.

of his agreement, he cannot recover on the special contract; but if the services rendered by him or the materials furnished are valuable to the other party, and are accepted by such party, then he would be liable to pay the actual value of the work performed, or the materials furnished, not exceeding the contract price, after deducting for any damage which had resulted from a breach of the agreement. There may be a recovery upon a *quantum meruit*, although the contract has not been complied with, but in such a case the petition must be grounded on a reasonable value, and it must not be declared on the contract.''

But in a case where the owner violates or breaches the contract, we universally say the plaintiff can elect to sue in *quantum meruit* rather than for damages on the contract. If he does so sue, the special contract performs no function in that suit. The defendant cannot undertake to limit the recovery by the terms of the contract, because he has breached the contract. To permit him to use his breached contract to limit a recovery against him, would be to pay to him a premium for his own wrong. The law does not contemplate such. The apparent conflict in our cases grow out of an oversight in considering this vital difference between the two classes of *quantum meruit* actions growing out of breached builders' contracts. To my mind it is not consonant with good reason to hold that an owner who has breached his contract, can yet use that contract to limit the amount of recovery in a *quantum meruit* action for labor and material which' he appropriated at the time he breached the contract. These loose expressions in our opinions are not sound law.

In the instant case the plaintiff by plain proof showed the reasonable value of the materials and labor furnished. That this value so shown was greater than plaintiff paid his sub-contractors does not change the situation. Plaintiff was entitled, in this action in *quantum meruit*, to the benefits of his bargain. He is only required to show the reasonable value, as such

is shown in any other action in *quantum meruit*. He is not precluded by what he pays for the material and labor. [Borden v. Mercer, 163 Mass. l. c. 9, and the cases cited.] Proof of what he paid, is of course admissible, on the question of reasonable value, but is not conclusive thereof.

The findings of the referee and court as to the reasonable value of the materials and labor furnished by plaintiff is sustained by the weight of the evidence, and should be affirmed.

VI. It may be true that defendant after suit was brought did pay some of the sub-contractors, on the theory that he was bound so to do under the contract, or had the right to so do under the contract. But neither this nor the trial court is responsible for this situation. Defendant chose to present his case on the theory of a valid subsisting contract, and framed his answer accordingly. When his theory fell under the proof his contract and all rights thereunder likewise fell. We can't go beyond pleadings, even in equity. Without an unbreached contract upon his part, the defendant had no right to pay the debts of plaintiff. Such voluntary payments cannot affect this case under the issues made. Defendant made its bed and must lie in it. The conscience of a chancellor is not pricked by the conduct of defendant and its paid servant, the architect. He who seeks equity must do equity.

*Voluntary Payments.*

The judgment should be affirmed. It is so ordered.

*Williams, J.,* concurs; *Faris, J.,* concurs in result; *Blair, J.,* concurs in separate opinion, in which *Graves, C. J.,* and *Williams, J.,* concur; *Bond, J.,* dissents in a separate opinion, in which *Walker* and *Woodson, JJ.,* concur.

BOND, J. (dissenting)—I. Plaintiff brings an action in *quantum meruit* to recover the reasonable value of material and labor furnished in the construction of a

<i>Statement.</i>

building and to establish a mechanic's lien therefor against the building and the real estate upon which it is situated.

The account exhibited contains a multitude of items of charge and a claim of a balance of $12,920.08, due after allowance of credits, for which judgment and a lien to secure the same are prayed.

The defendant answered that it had paid plaintiff for all the materials and labor furnished by him and, further, that under its contract with plaintiff it had the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to protect itself against lien claims.

The answer further averred that on the fifth day of June, the plaintiff abandoned said contract and refused to proceed further with the same and ceased all work upon said building; that plaintiff was then indebted to certain persons in certain sums for lienable claims; that thereupon, as soon as possible, defendant entered upon said building and caused the same to be completed and in so doing was compelled to expend $2654 in excess of the price at which plaintiff had contracted to construct said building.

The answer closed, to-wit: "Defendant states that by reason of all the facts aforesaid, this defendant has been damaged in the total sum of $5908, for which it prays judgment against plaintiff, together with the costs of suit."

Plaintiff filed a reply of a general denial and thereupon averred:

"Plaintiff for answer to defendant's set-off and counterclaim filed therein admits that he executed the written contract of February 21, 1911, mentioned in defendant's counterclaim. He admits that said contract contained substantially the various stipulations and provisions as alleged in said set-off and counterclaim.

"He admits that H. W. Powers and defendant jointly executed and caused to be served upon him

written notice dated May 31, 1911, containing statements as alleged in said counterclaim.

"He admits that said architect, jointly with defendant, executed and served upon plaintiff written notice dated June 2, 1911, containing assertions substantially as alleged in said counterclaim.

"He admits that on the 8th day of June, 1911, the defendant served a written notice on plaintiff containing substantially the language which said set-off and counterclaim alleges it did contain."

The reply further averred that defendant had breached the contract on June 1, 1911, wherefore the architect had no right to audit and certify the cost of finishing the building, and that the architect in giving the notices of May 31st and June 2d, as to defective materials, did so because he was dominated by the will of the officers of the defendant.

Upon the pleadings and issues joined a case for compulsory reference was presented, involving the testimony of fifty witnesses and many books of account; whereupon the court appointed George E. Smith, Esquire, to try all the issues of the case.

II. The nature of this case (compulsory reference) presents a preliminary question as to the correct rule for reviewing the findings of the referee and trial court Compul- on the evidence reported, which must be de- sory cided before examining the record. This in- Reference. volves a reconsideration of the recent ruling of this court in St. Louis to use v. Parker-Washington Co., 271 Mo. 229, where it was said such a review could not go further than to ascertain if there was any substantial evidence supporting the judgment of the trial court. That case is the only decision in this State which can be cited in support of the majority opinion. It is my opinion that case should not become a precedent. My reasons are:

First: It is contrary to the line of decisions extending through sixty-nine years.

Second: It is contrary to reason and justice.

Before taking up these two propositions in their order, I shall discuss some of the theories of references (and the statutes cited in support thereof) of the learned majority opinion. I shall advert to these statutes to show the imperfect view of the majority opinion, and its incorrect conclusions, and that it may be evident they have not been overlooked.

The learned majority opinion quotes only half of Section 35 of the Revision of 1825, page 630. The omitted part of the section, as will be seen at a glance, provided for the right of any party to a suit, on proper demand, to have a jury *"empanelled for the trial thereof;* but if neither party require a jury, the law and the facts may be determined by the court, or the court may refer such case to three or more indifferent and competent persons, whose report, if approved by the court, shall have the same effect as a verdict by a jury." If the learned majority opinion had quoted the section entire, it would have been apparent to any one that its contents referred to the rights of a party to a suit, first, where a jury was demanded; second, where a jury was waived, or what is the same thing, where a reference was consented to. The statute shows that without such waiver of a jury, or consent, the court was *powerless* to refer a case under that section; and that its whole purpose and intendment was to make provision for cases where a jury was required, or where the parties consented to the trial of a case without a jury. It gave the trial court no authority whatever to act in the latter contingency except upon the waiver of, or consent to, a trial without a jury. It could not have been, therefore, a *compulsory* reference statute; for its language shows that it provided for a reference only when a jury was waived.

It is self-evident, therefore, that the learned majority opinion was clearly in error when, referring to this section (Sec. 35, p. 630, R. S. 1825), it said "the reference was compulsory;" for on its face it shows it was *not* compulsory, and that the court could *not* direct it except upon *waiver of or consent to a trial*

*without a jury,* by the parties. It fell, therefore, in the strictest sense of the term, within the following rule of law: "The power of the court, with the consent of the parties, to refer a cause pending before it, is incident to all judicial administration where the right exists to ascertain the facts as well as to pronounce the law." [34 Cyc. 777, par. 2.] It was because the framers of the statute understood this to be the correct meaning of the statute, that they made provision therein that the report of the referee should have the same effect as the verdict of a jury, which is the rule in *consent* references as to any matter triable by a jury. [Implement Co. v. Harvesting Machine Co., 268 Mo. l. c. 369, par. 2.]

Neither is the majority opinion correct in stating, as it does, that this statute (enacted February 12, 1825) was the first one providing for reference in this State. That statute, instead of being the first in this State on the subject of reference, was simply a transcript by re-enactment of sections one and two of the Acts of 1807. [Geyer's Digest Mo. Laws, p. 256, secs. 36, 37.] It was adopted before statehood, when this was the Territory of Louisiana, May 7, 1807. [1 Mo. Ter. Laws, ch. 30, entitled "Courts," secs. 1 and 2, pp. 89, 90.] It was the re-enactment of this section in 1822 which the learned majority opinion incorrectly stated as the time of its beginning. [1 Mo. Ter. Laws, p. 851, sec. 42.] The truth is that the first appearance of a *compulsory* reference in courts of law in this State was nearly twenty years thereafter and was contained in Section 17, page 467, of the Revision of 1835, to-wit:

"Whenever an action shall be at issue in any court of record, such court may, with the consent of the parties thereto, in its discretion, order such cause to be referred to one or three impartial and competent men; and when it shall appear to the *court* that the trial of such action will require the examination of a *long account on either side,* such court may, without such consent, make the same order of reference."

The above statute was the true beginning of the provision for a compulsory reference in a court of law in the statutory history of Missouri. And, it will be observed, it predicates that right upon the necessity for the "examination of a long account on either side;" the identical language which was transcribed in the succeeding Acts of 1845, pp. 819, 825, secs. 20, 24, and in the Practice Act of 1849, p. 91, secs. 1 to 5, and which has been continued in every succeeding revision. [R. S. 1855, p. 1262, sec. 18; G. S. 1865, p. 674, sec. 18; R. S. 1879, sec. 3606; R. S. 1889, sec. 2138; R. S. 1899, sec. 698; R. S. 1909, sec. 1996.] This ground of compulsory reference has been unvaryingly construed by the courts, as will be hereinafter shown, until the advent of the ruling in the Parker-Washington case. The fatal fault of the learned majority opinion in its references to the statutes providing separately for practice at law and practice in chancery is, that it does not connote the fact that when the "examination of a long account on either side" was first introduced in this State by a proper grant by the Legislature, it thereby gave to courts of law the right to act concurrently with courts of chancery in this State. Such grant by the Legislature did not oust courts of equity of their previous jurisdiction, acquired because of the inability of courts of law to render adequate relief. The rule on that subject is fundamental and rests upon the "well settled maxim by which courts of equity retain a jurisdiction originally acquired by reason of the want of a complete and adequate relief at law, notwithstanding the common law courts have been subsequently invested by the Legislature with full power over the subject." [Clark v. Henry's Admr., 9 Mo. l. c. 338; Dobyns v. McGovern, 15 Mo. l. c. 668; Brandon v. Carter, 119 Mo. 581; Bank v. Clifton, 263 Mo. l. c. 217.]

The learned majority opinion also says that a "very long or intricate account" is not for that reason the subject matter of jurisdiction in equity because a remedy at law would be inadequate—a statement which is untenable under all the authorities and text-

writers, which are to the effect that a very long and intricate account not adapted to a trial by a jury has been the basis of jurisdiction in equity from the very beginning of the court, irrespective of whether the items of the account are legal or equitable in nature, and that jurisdiction has been steadily maintained from the very necessity of the case. A prime cause for the adoption of this jurisdiction by equity was the utter inadequacy of the ancient common law action of account, which was useful against guardians, bailiffs, receivers, etc., and which was subject to the peculiarity that it involved two judgments; first, that the plaintiff and defendant account together; secondly, that the plaintiff or defendant recover the balance found to be due. [1 R. C. L. p. 222-223, secs. 23-25; R. S. 1835, p. 37, sec. 6 et seq.] This is clearly shown in a recent careful compendium of the law, to-wit:

"Matters of account form a class of cases wherein courts of equity exercise a concurrent jurisdiction with courts of law. Whether this jurisdiction originally arose from the necessity of obtaining a discovery by the oath of the defendant, or in order to prevent a multiplicity of suits, is not definitely known. It is, however, certain that courts of equity began to assume it at a very early period, and that the exercise thereof has been found in practice so convenient and salutary, that it has long since, by general consent, rendered *obsolete the common law remedy by a writ of account* which was one of the most ancient forms of action at the common law. In all cases of mutual accounts courts of equity have for a long time exercised a general jurisdiction on the ground of the *inadequacy of the remedy at law* . . . *But now the jurisdiction extends, not only to cases of an equitable nature, but to many cases where the form of the account is purely legal.* . . . In such cases mutuality of the accounts, of course, adds to the difficulty of accounting, and may give equity for this purpose when the bill would not have equity but for the mutuality; but it is not indispensable to equity jurisdiction for

accounting. If the accounts be wholly on one side, but are numerous, complicated and difficult, and extend over a considerable period of time, and involve many transactions, an acounting in equity would be proper." [10 R. C. L., p. 355, sec. 103, title "Accounts;" 1 R. C. L., p. 222, sec. 24; 1 Corpus Juris, pp. 614, 615, secs. 2 and 3; Foley v. Hill, 2 H. L. Cas. 28; Fowle v. Lawrason, 5 Peters, 495; Ludlow v. Simond, 2 Caine's Cas. 1, and sep. opin. by Chancellor KENT; Hagan v. Bank, 182 Mo. 1. c. 335, 336.]

The misconception of the established jurisdiction of equity in such cases, runs through the warp and woof of the majority opinion and leads it into a profitless discussion of the accuracy of a footnote on page 199 of the Revision of 1855, to the effect that the sections of such statute (Sec. 27 et seq.) *incorporate* the provision of Article 4 of Practice in Chancery in the Code of 1845. In dealing with this footnote, the majority opinion fails to note that it merely says certain sections of Article 4 are *"incorporated* in the succeeding sections." It does not say (as inadvertently stated in the majority opinion) that the entire act set out in the Revision *was taken* from Article 4 of the Revision of 1845. (It seems, however, from a comparison that 13 of the 14 sections of the Chancery Practice Act of 1845 were substantially incorporated in the Revision of 1855.) But the derivation of the various provisions of the acts of 1855 is wholly unimportant in view of the fact that, like all subsequent revisions, it does embody the exact language of the practice act providing for a reference of *"a long account on either side,"* as furnishing the only statutory basis in any court to compel a reference in a case like the one at bar. The important thing to be determined in the instant case is the construction and proper method of review of this particular clause. Its origin in 1835 has been pointed out and shown to have been but a grant to courts of law of concurrent jurisdiction previously exercised over such matters in courts of chancery by statute to that effect before the importation of the

common law. [1 Ter. Laws, p. 241, secs. 1 and 10, enacted Oct. 26, 1810; Ibid, p. 436, enacted Jan. 19, 1816.] It was, therefore, a matter of no moment whether a provision giving concurrent jurisdiction to courts of law and equity was taken from the statutes relating to practice in the one or the other court, the real question being as to the nature of the jurisdiction exercised under the clause, which, as has been shown, was equitable. When the Practice Act was subsequently adopted, it abrogated all prior separate statutes relating to practice at law or in equity, and substituted therefor one form of action, triable as before in one forum, so that suits, thereafter, whether legal or equitable, should be controlled alike by common procedural statutes. [Laws 1848-9, p. 73, sec. 1.] The effect of this system was to authorize the circuit courts to exercise thereafter chancery powers in any suit embracing issues which required, for proper solution, the use of equity powers or instrumentality, or which should embrace subjects lying within the concurrent cognizance of courts of law and equity. The common statute governing circuit courts, thereafter and at present, authorized a reference without consent whenever the case presented by the pleadings required the examination of "a long account on either side." The power of the circuit or appellate courts to review the evidence before the referee in such cases is not impaired by the fact that the statute, now Revised Statutes 1909, section 2013, and in previous revisions, recites that the reports of such referees, *"if confirmed,"* would afford the basis of a judgment as upon the verdict of a jury. The expression *"if confirmed"* shows that such reports were necessarily open to review *before* confirmation. The statute does not, in any way, prescribe the particular method of this review. It merely provides that if, as a consequence of such review, the report should be "confirmed," then it might be treated as a basis for a judgment just as a verdict of a jury would have been. Obviously no other use of the "confirmed report" could be made than to render

judgment thereon, for if that could not be done, what would be the purpose of considering it at all? This is the correct sense and meaning of the provision, which, we may add, was before this court in every appeal in a compulsory reference case for sixty-nine years, during which the full power of appellate, as well as trial courts, to review the findings of fact of the referee and trial judge, has been steadily maintained, as will hereinafter appear. An identical provision is in the Wisconsin Act, and an identical contention was disposed of by WINSLOW, J., when interposed against the rule in that State, that the findings of a referee, if against the clear preponderance of the evidence, would be set aside "even though there may be some evidence to support them." Said that jurist:

"We have not overlooked the last clause of Sec. 2865, Stats. 1898, which provides, 'When the reference is to report the facts the report shall have the effect of a special verdict.' This clause has existed in the same words and connection ever since the adoption of the Code (Sec. 182, Ch. 120, Laws 1856), and it must be considered as definitely construed by the cases above cited, all of which were decided during the existence of the provision." [Johnson v. Goult, 106 Wis. l. c. 251.]

Moreover, the section under review is not susceptible of any other rational construction, for it is elemental that though the verdict of a jury may be set aside by a court of law, yet a law court cannot substitute its own findings of a lesser amount than the verdict of a jury without the consent of both parties to the suit. It must take the verdict as a whole or set it aside as a whole and grant a new trial. This is conceded when such courts (as is sometimes done) order a new trial unless the parties consent to a lesser verdict, for the plain reason that a common law court cannot substitute its own findings for a lesser amount than was found by the jury, without the consent of both parties. On the other hand, in case of reports of referees in compulsory references, it is admitted (even in the Parker-Washington case, supra) that the trial court has full power to

review the findings of fact of a referee and substitute its own for a lesser amount. In the instant case the trial court *did* reduce the findings of the referee by nearly *two thousand dollars,* and rendered judgment for *its own findings* in lieu of the sum reported by the referee. It is perfectly obvious, therefore, that the statute providing that *"if confirmed"* the report of a referee should furnish a basis for judgment as upon a special verdict (R. S. 1909, sec. 2013, which identical section existed since the beginning of the law providing for such referees) could not have meant to bind the trial and appellate courts, as they would be restricted in dealing with the verdict of a jury; for such a conclusion would prove too much, in that it would involve the absurd result that a report of a referee in a compulsory reference could not be modified nor altered as to amount, even by a trial court: a proposition not insisted upon in any of the dicta of the cases relied upon in the Parker-Washington case, and opposed to the whole current of decision in this State.

All that need be said as to the *correct* decision that a compulsory reference statute is not unconstitutional (Ice Co. v. Tamm, 138 Mo. 385) is, not that it was twenty years older than the Constitution of 1875 (Edwardson v. Garnhart, 56 Mo. l. c. 85); but that the statute simply empowered a court of law to act as a court of equity. As to which said Judge RYLAND:

"Nor do we consider the statute thus authorizing the court to appoint referees, unconstitutional, as trenching upon the trial by jury. It has ever been the practice of the courts, in somewhat kindred cases, to appoint *auditors* or referees, to settle accounts; nor has the power even been seriously disputed before."

Judge RYLAND was evidently referring to concurrent jurisdiction in courts of chancery to refer accounts to auditors, set forth in Territorial Laws, vol. 1, p. 241, secs. 1 and 10, under title, "Practice in Chancery." He subsequently added:

"We now have no courts of equity, nor any equity proceedings, as formerly practiced; all the distinctions

between the proceedings of these courts have been destroyed under the force of innovation. ¬ This action admits of all defenses; the rules of evidence therefore apply in this case, so as to make that a defense here which formerly was considered one in equity." [Shepard v. Bank of Mo., 15 Mo. 151, et seq.]

The doctrine of this case fully supports the conclusion reached that the statute in question is not unconstitutional, since it is the settled law that none of the guaranties of a right to a jury trial in the constitutions of this State were ever intended to apply in cases within the jurisdiction of a court of equity.

III. Having dealt with the statutes and the collateral questions contained in the learned majority opinion, it now becomes necessary to consider the vital question, which is whether the Parker-Washington case can be sustained under the unbroken line of decisions in this State, touching the scope of review in compulsory references.

*Parker-Washington Case.*

The statute relating to references, both consent and upon compulsion, are now contained in the Revision of 1909 (secs. 1996 to 2013, inclusive) and are the same as to the clause providing a reference against consent for the examination of "a long account on either side," as in all the prior statutes, running back to the Practice Act and to its origin in 1835. It is, therefore, this identical clause (and not to references by consent, based on different grounds and governed by a different rule, Implement Co. v. Harvesting Machine Co., 268 Mo. l. c. 368), which must be carried in mind when investigating the decisions in this State applicable to compulsory references.

In determining the rights of the parties in appellate courts in cases of compulsory reference, the rule and practice that the evidence reported to the court by the referee is reviewable both in the trial and appellate courts, were invariable until the recent ruling in St. Louis to use v. Parker-Washington Co., supra, as will appear from the decisions of this court and those of the courts of appeals, now to be noted.

In Ely v. Ownby, 59 Mo. 437, suit was brought on the bond of a sheriff and after judgment a referee was appointed who reported that one of the sureties on the sheriff's bond should be charged with the balance of $2185. Upon exceptions this report was reduced by the trial court to $729. In the language of Judge NAPTON: "The questions presented by the record are, therefore, confined to the decisions of the circuit court in striking out from the report of the referee one item allowed to Ely and in striking out certain items allowed against Ely and thereby reducing the judgment to $729.45." Judge NAPTON then stated the rule: "As the referee reported to the court all the evidence on which he acted, there can be no question that the court could review his conclusions and correct them when erroneous. *And this court must determine the point in controversy as the circuit court would upon the evidence reported.*" (Italics ours.)

That decision was affirmed by the court speaking through Judge BLACK in an attachment suit where the referees reported all the evidence and the rule announced in the following terms: "Under the present statute [identical with the one under review] the constant practice in a large class of cases is for the courts to review the findings of the referee upon the evidence reported by him, and to correct the findings when erroneous. When the evidence is preserved, these findings may be reviewed and corrected on an *appeal to this court,*" citing cases; but an examination of these cases will show that they either involved an examintion of large accounts, or were suits in equity. The right of the court to correct the findings of fact made by the referee on the evidence reported, must be confined to those cases where the court may, under Section 3606, Revised Statutes [now Sec. 1996, R. S. 1909], direct a reference without the consent of all the parties, and to suits in equity where there is a reference by consent of all the parties." (Italics ours.) [Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. l. c. 488.]

That decision was affirmed in a suit on a treasurer's bond, consolidated with a second suit on another bond, and referred by consent. [State ex rel. v. Hurlstone, 92 Mo. l. c. 332.] In disposing of the point under review, Judge BLACK, in the clearest terms, stated the distinction between the reviewability of a compulsory reference and other references not falling in that class, saying: "It is further urged that the court could not modify the findings of the referee. In the case of Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 484, we held that in actions at law not coming within the provisions of Section 3606, Revised Statutes [R. S. 1909, sec. 1996] the court could not on a simple agreement to refer the issues to a referee, review the evidence and make a finding contradictory to the finding made by the referee, because in such cases the parties are entitled to a jury and an agreement to refer to a designated person is no agreement that the court may try the facts. *But it is there shown that in those cases where the court may, on motion of either party, without the consent of the other, or on its own motion, direct a reference, it may review the findings of the referee on the evidence reported.* Now in this case it is clear that the trial required the examination of a long account and the court had the right to make a reference of its own motion and hence could review the findings made by the referee." (Italics ours.) The court refrained from passing on the evidence reported by the referee, because there was no motion for new trial and nothing was presented for review except the record proper. [92 Mo. l. c. 332.]

In Wentzville Tobacco Co. v. Walker, 123 Mo. l. c. 671, an action on a bond executed by the plaintiff, it was complained that the obligor had taken credit to himself, without authority, as secretary and treasurer of the plaintiff company, in about forty instances. The case was sent to a referee, who reported, recommending judgment for $1209.69. On an appeal the books which formed the basis of the report were not made a part of the record. On account of the absence of this testi-

mony, the court was prevented from reviewing the evidence before the referee and the trial court, but stated the rule in the following language: "In causes wherein the court may lawfully direct a compulsory reference, it may likewise act upon the evidence reported by the referee, and find therefrom different conclusions of fact from those reported by the referee. This should now be taken as settled law under the rulings in Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 484, and State ex rel. v. Hurlstone, 92 Mo. 327, without reopening the question they adjudge." It was said that the trial court acted within its power in setting aside the report of the referee and finding for the defendants, to which was added: "Whether the court committed error in so doing, we cannot investigate (assuming that we have the power) in the state of the record already described." [123 Mo. l. c. 671.]

In Small v. Hatch, 151 Mo. l. c. 307, a suit in equity to foreclosure a deed of trust where the defendant prayed an accounting, a reference was ordered. In speaking of which, this court said that notwithstanding the fact that the reference was sought by both parties, it was obviously one which the trial court might have compelled, citing the cases above referred to and thereupon added (GANTT, P. J.): "This being a reference which the circuit court could review on the evidence reported and render its own judgment thereon, the judgment of the circuit court is *likewise reviewable in this court.* In such cases while this court ordinarily defers to the judgment of the circuit court, it is settled law that we are not bound to adopt the decree of the circuit court if, upon a re-examination, we are of opinion that it has erred."

In Williams v. Railroad, 153 Mo. 487, a case where the plaintiff sought to establish a mechanic's lien, before examining the long account, GANTT, J., speaking for the court, said: "The reference in this case was by consent of both parties duly entered of record, but it was referable without the consent of either.

The long and intricate account rendered it peculiarly proper for a reference. In a word, it was a case for a compulsory reference. In such cases it is the settled law of this court that the circuit court may on the motion of either party review the findings of the referee on the evidence reported and make its own findings and *this court on appeal may review the findings and affirm* or reverse the judgment of the circuit court in whole or in part," citing the statute under review and the cases above referred to. "On this point of practice both parties are agreed." (Italics ours.) [153 Mo. 1. c. 495.]

Having thus announced the principle governing the consideration of voluminous evidence reported by the referee, Judge GANTT proceeded to determine, by an analysis of the weight and probative force of the testimony, whether or not the trial court had abused its discretion in considering the evidence. For the purpose of solving that question Judge GANTT took up each finding complained of, and considered the relevant evidence, and at the conclusion of an opinion of more than fifty pages, reversed the judgment of the circuit court and remanded the cause with directions to enter a judgment in accordance with the findings made by him on full review of the testimony. [153 Mo. 1. c. 495, 511, 519, 548.]

He also announced and applied the same rule in Lack v. Brecht, 166 Mo. 1. c. 257.

In State ex rel. v. Reynolds, 245 Mo. 698, the plaintiff sued on a long account involving an amount beyond the jurisdiction of the St. Louis Court of Appeals. The case came here as the result of a prohibition. In disposing of it, LAMM, J., speaking for the court, said that "the original action was at law," but "that the case belonged to a class subject to compulsory reference." He then announced upon a full review of the authorities, the rule governing the disposition of the case, to-wit: "Whatever be the rule in cases that could only be sent to a referee by agreement of parties, yet where a cause in equity is sent to a referee *or*

*where a case at law* (subject to a compulsory reference) is sent to a referee, the *settled rule* is that a trial court may not only sustain exceptions to the referee's report and set aside his findings, but may go on and make findings of its own and render judgment contrary to that recommended by the referee; and (which is closer home) all of such rulings and acts *nisi* are sub-ject to review by an appellate court and to its re-vising judgment when (as here) exceptions are properly preserved below and brought up for disposition above. [Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. l. c. 488; State ex rel. v. Hurlstone, 92 Mo. l. c. 332, et seq.; Wentzville Tobacco Co. v. Walker, 123 Mo. l. c. 671; Small v. Hatch, 151 Mo. l. c. 306; Williams v. Railroad, 153 Mo. l. c. 495; Smith v. Baer, 166 Mo. 392; Vide, State ex rel. v. Woods, 234 Mo. l. c. 26, and Star Bottling Co. v. Exposition Co., 240 Mo. l. c. 639.]"

That opinion was fully concurred in by every member of the Court in Banc.

The same rule was applied in Vandagrift v. Masonic Home, 242 Mo. l. c. 154, and stated in State ex inf. v. Ark. Lum. Co., 260 Mo. l. c. 274.

This rule was thereafter followed in Division No. One in an opinion (Reed v. Young, 248 Mo. l. c. 613) which explicitly set forth the distinctions as to the power of review in appellate courts in cases non-refer-able, except by the consent of the parties, and those subject to reference regardless of the wishes of the parties, for the reason that they involved a long and complicated account. That opinion also calls attention to the reason for the distinction in the power of supervision of the two classes of cases and concludes: "And, hence, it has been well decided that the trial and appellate courts have the full right to review the findings of the referee in the instances mentioned in the statute, to-wit, where a long account is to be examined or an account to be taken for the information of the court or where a question of fact collateral to the plead-ings arises." [248 Mo. l. c. 613.] This case also

discussed the underlying reason of the rule as a code adaptation of chancery machinery.

The same rule has been explicitly stated and followed in Division No. Two, in Sonnenfeld v. Rosenthal, 247 Mo. l. c. 250.

In a full discussion of the statute under review, the St. Louis Court of Appeals followed the rule of this court In Banc and its two divisions as expressed in the three cases last referred to. [Valleroy v. Enright, 179 Mo. App. 557-8.] And by the Springfield Court of Appeals in Phillips v. Todd, 180 S. W. 1043. To the same effect is Bond v. Finley, 74 Mo. App. l. c. 25.

From 1849 to 1917 the rule and practice of a full review in the trial and appellate courts of the findings of fact in cases of compulsory reference, was applied in every case where the point was in judgment, except the single instance of the ruling in St. Louis to use v. Parker-Washington Co., supra. In that case for the first time it was held, that in a compulsory reference, this court could not further review the findings of a referee or the judgment of the trial court, on the evidence reported, than to see whether there was any substantial evidence tending to support such findings. In other words, this court could no further weigh the evidence than it could weigh the evidence after a verdict of a jury in cases triable by juries. That view, in my opinion, is as demonstrably erroneous and unsound in principle and reasoning, as it has been shown to be opposed to the practice and procedure and previous decisions of this court, all of which it *mutely* reverses. It is not supported by a single decision of the Supreme Court of this State where the point was before the court and held in judgment. Obviously it simply followed the personal view of the learned writer of the opinion adopted by this court in State ex rel. v. People's Ice Company, 246 Mo. 168. Twice in that case it was stated that the question as to the proper rule for reviewing such findings of a referee *was not decided,* since the case

turned on other questions requiring the affirmance of the judgment. Said the writer of that opinion, in speaking of the two rules, after citing two cases which he deemed illustrative of each, the difference "need not be decided. In this case the conclusion under both rules must be the same." And again, he said: "It may be added that the rule contended for, even if sound, could *not be applied to this case,* since the referee, after admitting evidence" of certain transactions, excluded them from view, whereas the trial court considered the excluded evidence; wherefore it was held that "the real difference is as to the admissibility of certain evidence, and that is a question of law." (Italics ours.) [State ex rel. v. Ice Co., 246 Mo. l. c. 211, 212.] It is thus beyond question that the judgment in *quo warranto* in the ice case. was put on other grounds and did not involve in , any sense the adjudication and application of the proper rule for reviewing findings of the referee and trial court in cases of compulsory reference.

It is perfectly plain that if the remarks of the learned writer of that opinion had been other than an expression of his personal view, the decision would not have been adopted by this Division, of which LAMM, J., was then a member, for it would have been diametrically opposed to what that learned judge had said, with the concurrence of the entire Court in Banc, in a previous volume (State ex. rel. v. Reynolds, 245 Mo., supra) to which ruling, it may be added, the learned writer of the opinion in the Ice case did not advert or make any allusion whatever. He not only expressly refrained from putting his decision on the ground of non-reviewability of the findings of the referee, but referred to no authoritative case in this State in support of his individual views. Indeed, the observation is simply expressive of the mental inclination of the writer of the Ice case and is not even claimed to be supported by any ruling of this court in any case *requiring for its decision* the application of the rule as to the reviewability of the findings *nisi.* The only

countenance it ever had were other observations or *dicta* irrelevant to the cases in which they were uttered, as will now be shown by reference to every case in this State cited by the learned writer.

The first of these cases is Utley v. Hill, 155 Mo. l. c. 276. There a depositor sued the directors of a bank for money lost by its failure. The first count was on the statute making directors responsible for deposits received with knowledge after the bank was insolvent. The second count was an action for deceit. Defendant had judgment after a report by a referee on both counts. The evidence was *not* preserved on the appeal to this court. Hence the single question was the authority of the trial court to review the report of the referee. It was held that could be done under the authority of Wentzville Tobacco Co. v. Walker, 123 Mo., supra. Nothing else was presented for decision in the case, but MARSHALL, J., expressed his personal view to the effect that this court would have had no right to review the finding of the trial court even if the evidence were properly before it in a case of compulsory reference. It is evident from the facts in judgment that this remark on the part of the learned judge (MARSHALL) was entirely foreign to the matter which the court was called upon to decide and, therefore, was not in any sense a decision of the question now under review, *and this is frankly stated by the learned writer of the opinion in the Ice case;* for in referring to that opinion he said: "It is true that the evidence *was not before the court* and the point need not have been discussed. The fact that the remark quoted was *obiter* does not, however, deprive it of all its value." (Italics ours.) [State ex rel. v. Ice Co., supra, l. c. 202.] In view of this express admission, it cannot be necessary to go further in order to show that the case of Utley v. Hill, supra, on the point held in judgment, was *not* a decision of this court supporting the contention that the evidence reported in a compulsory reference is not reviewable on appeal.

The case of Smith v. Baer, 166 Mo. 392, is referred to. The first count of the petition was on a note for $1200; the second count was for $5710, as half the losses which it was alleged the plaintiff was entitled to recover from the defendant. The case was sent to a referee and that fact was the first error assigned in this court. This was ruled against the appellant, for the reason that *no bill of exceptions* was taken when the order of reference was made. [Ibid l. c. 401.] The final contention of appellant related to a review of the findings of the referee. That was denied for the reason, as stated in the opinion, that the abstract "is not sufficient to inform the court" of the nature of the evidence. [Ibid, l. c. 404.] And again, on the very next page (405) the court added that a stronger reason than the failure of the abstract to show the evidence existed, in that the pleadings did not raise any question as to the evidence sought to be reviewed, using this language: "There is much more cogent reason for refusing to consider the evidence upon this contention and that is, no such issue was raised by the pleadings in the case." The judgment was affirmed as being for the right party. MARSHALL, J., however, made another observation not called for by any fact in judgment, to the effect that if the case had been one calling for the review of a compulsory reference, it ought not to be in the power of this court to review it. In order that it might be plain that the extraneous observation of MARSHALL, J., did not meet his approval, VALLIANT, J., concurred in a separate opinion eschewing any participancy in such a view, saying: "In trials before a referee there is no difference in mode in an equity case and a law case. It will not be disputed that it is the duty of the trial court to review the evidence and set aside the findings of the referee if in the opinion of the trial judge they are against the decided weight of the evidence. This he must do in an equity as well as a law suit. Yet the trial judge in that respect is not in any better position

to weigh the evidence than is an appellate court; he has seen none of the witnesses and has only what the appellate court has, that is, the record of the testimony as returned by the referee. Therefore I maintain that as long as we adhere to the practice of reviewing the findings of fact by a referee in equity cases, and setting those findings aside and substituting our own, when we are of the opinion that the evidence so requires, we should treat his findings of fact in a law suit in the same way." [Ibid l. c. 408.]

It is apparent that Smith v. Baer, supra, did not decide the question mooted in State ex rel. v. Ice Co., and that the *dictum* of Judge MARSHALL in that case was entirely off the points presented for judgment, as shown by the quotations from his opinion, and, therefore, furnished no legal or logical support for the *dictum* in the Ice case, which seems not to have analyzed the case of Smith v. Baer. Hence the non-judicial character of Judge MARSHALL's remarks escaped notice.

The case of Caruth-Byrnes Hdw. Co. v. Wolter, supra, seems to have been misapprehended in the Ice case. That was a legal action commenced by attachment, which the defendant *unavailingly* sought by an interplea to convert into an equitable proceeding. The case was reversed solely on the ground that the court denied the right to a jury, which it was directed on a new trial to accord, "unless a jury is waived or new referees agreed upon." In the course of the decision Judge BLACK stated with the greatest perspicuity and completeness the rule applicable to compulsory references and also the different rule applicable to other references by consent, holding in the one case that the findings of the referee and the trial court "may be reviewed and corrected on an appeal to this court," and in the other (references of legal actions by consent) that there was no review other than that applicable to the verdict of a jury, citing Daly v. Timon, 47 Mo. 516. The decision in that case is authoritative

and is contradictory of the notion that in compulsory references there is no broader review of the evidence reported than in legal actions referred by consent. It was necessary for Judge BLACK to determine to what *class* the pending action belonged, and to adjudicate the different rules applicable to each, which he did with a citation of authorities in accord with the settled law in this State, as fully appears from his opinion showing why and how and for what reasons and with what directions the case was reversed. I am, therefore, wholly unable to perceive any solid ground for the theory suggested in the Ice case (l. c. 204) that by using the expression "reviewed and corrected on appeal" Judge BLACK did not mean (what the words obviously import) a supervising power in this court on appeal to weigh the evidence. It seems to me to be illogical to endeavor to minimize the significance of this phrase in the light of its familiar meaning in legal phraseology, as it is applied to the practice and procedure of appellate courts. A glance at the words shows that the evidence may not only be "reviewed" but "corrected on appeal." This is a vastly different power from the mere ability to examine a case for the purpose of discovering if there was *any* evidence adduced in support of a finding. The contrary view expressed in the Ice case, supra, (l. c. 204), seems to me to be etymologically unsound and opposed to the invariable sense in which the words have been understood by courts, text-writers and lawyers.

The case of Williams v. Railroad, 153 Mo. l. c. 511 et seq., is referred to in the Ice case. The ruling and action of the court in that case are evidently misapprehended. As shown in the quotations therefrom heretofore made, Judge GANTT applied the rule of full reviewability and correction on appeal of the findings of a referee to the evidence reported in a compulsory reference. Postulating that principle, he thereupon said the evidence should be examined to discover whether the trial court had abused its discretion in

weighing the evidence, for clearly a court sitting as a chancellor would abuse its discretion if it found against the clear preponderance of the competent testimony. Acting under that rule and proceeding to weigh the evidence for that purpose, Judge GANTT took up the findings of the referee *seriatim,* using in reference to the investigation of each succeeding item, the following language: "The next finding of the referee to be considered" (Ibid. 514, 519), and so on until the conclusion of a long and elaborate review and weighing of the testimony, culminating in a conclusion based upon its preponderance, reversing the judgment and directing a decree in accord with his own finding in this court. [Ibid, p. 548.] It is palpable, therefore, that Judge GANTT, not only announced, as shown in a former quotation from his opinion, the correct rule as to the review of a compulsory reference, *but applied it in that case.*

Judge GANTT, also, in a succeeding case, announced and applied the same rule of full reviewability and cited Williams v. Railroad, 153 Mo. l. c. 495, in support. [See Lack v. Brecht, 166 Mo. l. c. 257.] It would seem, therefore, that the full import and actual application of the rule stated in Williams v. Railroad was not fully appreciated in the Ice case.

I think this concludes the citations relied upon in the Ice case, except one excerpt from the Court of Appeals which was supposed to give countenance to the view of the writer. It is only necessary, as to that, to add that such is not the holding of the St. Louis Court of Appeals, as will appear from the clear, complete statement of the rule by NORTONI, J., in 179 Mo. App., supra.

From this review of the decisions in the Ice case, it is obvious that the undecided *dictum* in that case, supported only by a *dictum* of Judge MARSHALL in another, affords no basis of support for the ruling made in St. Louis etc. v. Parker-Washington Co. supra.

The only other case cited in the Parker-Washington case is Berthold v. O'Hara, 121 Mo. l. c. 97. That was

an opinion by Judge GANTT. The suit was in two counts, one for the sale of lumber amounting to $3647.76; the other on a draft or bill of exchange for $2500. The answer sought to set up a counterclaim for an unsettled partnership account. The court held, *as a matter of law*, that the alleged account was not pleadable as a counterclaim. The referee also found that this counterclaim did not in any way appertain to the matters set up in the two counts of the petition. No point was made as to his findings in that respect. [Ibid., 1. c. 93.] This left the suit a simple action at law, not involving in any sense the elements of a compulsory reference. The case was referred and there was nothing in the record to show that the reference was not by consent, which was presumably the case, since no objection to the reference appears in the record. From the nature of the suit it is apparent that it did not fall in the class of cases which may be referred without consent. The report of the referee, therefore, stood in the place of a verdict of a jury and it was so held by Judge GANTT. The decision in that case was, therefore, wholly inapplicable to the point under review in the Parker-Washington case, where the reference was strictly a compulsory one, being based upon a long and intricate accounting as provided for by statute. Besides, it is evident that the writer of the opinion in the O'Hara case had no thought of dealing with compulsory references, as that question was not before him and he was the same judge (GANTT) who wrote the Williams case, supra, and Smith v. Baer, wherein (compulsory references being under review) he stated the converse of the rule applied in the O'Hara case. With the constant consciousness on the part of that learned judge of his previous decisions when writing opinions in succeeding cases, it is impossible to infer that he meant to do other than state the respective rules applicable to the essentially different character of references. The Parker-Washington case, being thus bereft of support other than the *dictum* in the Ice case (the O'Hara case being wholly off the point), would seem

to be contrary to all previous decisions in this State
where the rule as to reviewability of compulsory refer-
ence was held in judgment. That case is not only un-
sustained by any previous precedents in this State, but
it is unsustainable in reason and principle: it overlooks
the essential distinction between a "long and compli-
cated account" and the simple legal elements of an
ordinary action of assumpsit. The latter presents a
proper case for a jury; the former does not, and hence
demands the use of the instrumentality of a court of
equity for the adjustment of intricacies. The reason
for the rule limiting review on appeal of the verdict
of a jury, must cease to exist in all cases not submissible
to a jury. Equity then takes jurisdiction, not because
of the nature of the demands or items constituting a
long and complicated account, but because of defects
in the machinery of courts of law disabling them from
affording an adequate remedy. Hence, the statutory
provision making it the duty of the trial court. to em-
ploy a referee, as equity would use a clerk and master,
to take and state an account of matters unfit to be
sent to a jury, was adopted in our Practice Act by
providing for practically the same method which had
been previously prescribed by the rules governing
chancery practice. This was a wise and wholesome
statute in view of the new code vesting in the circuit
judge the powers of a chancellor and making it his
duty in such cases, upon the presentation of a case
showing matters unsuited for trial by a jury, to refer
such matters to a referee possessing powers similar
to a master in chancery. This tended to facilitate the
administration of justice. In devolving such a power
upon the circuit judge, the statute invests him with a
power which is incident to the chancery functions de-
volved on him by the code and enables him, in that
capacity, to make use of an instrumentality appurtenant
to courts of chancery whenever, as in the case of long
or complicated accounts, a subject-matter of concurrent
jurisdiction in equity is presented in the pleadings.
This being the logic of the rule, it necessarily follows

that the supervisory control of the trial court and the
Supreme Court is not less full and ample in references
of that character, than in equitable actions triable
without a jury. This, as has been shown, was lucidly
stated by VALLIANT, J., in a separate opinion written
by him to disapprove of the *dictum* of Judge MARSHALL.
From the foregoing review it is apparent that the
Parker-Washington case is contrary to every previous
ruling on the point in judgment in this State, which
fact is noted also in 34 Cyc. 885, note 86, citing
Missouri cases, any by the learned annotaters of the
Revision of 1909 citing cases under Section 2013. That
it is a radical departure from the whole previous
course of practice and procedure in this State, cannot
be denied. I do not think it can be supported by
valid reason; for if the matters warrant a compulsory
reference, then there can be no reason why this court
should not have the same supervision of the findings
of the referee or trial court in such cases, which it
has in all other cases triable without a jury, of which
equity has concurrent jurisdiction. Why the findings of
a circuit judge and a referee should have greater con-
clusiveness in one than the other, I am unable to
perceive. Such a distinction would seem to be purely
arbitrary and in contravention of the breadth of inquiry
which is characteristic of all improvement in the ad-
ministration of justice. That motive, its long settled
rule and practice, and the reasons heretofore given,
should impel this court to recede from the view ex-
pressed in the Parker-Washington case, supra, and to
re-affirm the rule, as to review on appeal of cases
of compulsory reference, stated in the cases heretofore
cited, thereby restoring harmony and certainty in the
administration of the law.

IV. Under the pleadings in this case an issue
was made as to who, plaintiff or defendant, breached
the building contract. My personal view, from an exami-
nation of the record, and especially the documentary
evidence therein contained, is that plaintiff breached

**Architect.** the contract, for the reason, first, there was
**Fraud of** a dispute between the parties as to the amount
**Breach of** payable in June, 1911; secondly, it had been
**Contract:** specially stipulated in the building contract
that no payments should be made except upon the
certificate of the architect. The architect's letters
show that he refused to issue the certificate on account
of defective work and materials. In the absence of
fraud on the part of the architect in so doing, the
defendant was entitled to stand on its contract
to pay *only* upon the architect's certificate.
Plaintiff realized the burden thus cast on him and
sought to establish that the architect was guilty of
wrongdoing in withholding his certificate. I do not
think he sustained that burden. He did not testify
to any fraud on the part of the architect, whose deci-
sion was therefore conclusive. [Williams v. Railroad,
112 Mo. l. c. 493; Williams v. Railroad, 153 Mo. l. c.
499; Thompson v. St. Charles County, 227 Mo. l. c.
233.] But in the view I take of this case, that is a
question which need not be decided; for, as I maintain,
the law is the same as to recovery of damages for
breach of a building contract, through the medium of an
action of *quantum meruit*, regardless of whether the own-
**Quantum** er or contractor committed the breach. [Yeats
**Meruit.** v. Ballentine, 56 Mo. l. c. 538; Williams v. Rail-
road, 112 Mo. l. c. 494; Drainage Dist. v. Surety Co., 252
Mo. l. c. 564 et seq.; Lasar Mfg. Co. v. Pelligreen Co., 179
Mo. App. l. c. 455; Herman v. Imp. Co., 58 Mo.
App. l. c. 485, and cases cited; Moore v. Gaus Mfg.
Co., 113 Mo. 98.] I also think the intimation to the
contrary in McCullough v. Baker, 47 Mo. 401, should
be disapproved. As said by the St. Louis Court of
Appeals (Kelly v. Rowane, 33 Mo. App. l. c. 446) the
rule applied in 47 Mo. is a harsh one. The effect of
that rule is to permit a contractor who has been pre-
vented from the completion of his building contract by
the act of the owner, by resorting to an action of
*quantum meruit*, to recover what he could not recover
if he had brought a suit for the breach of the contract.

In the latter case the rule is settled that no recovery can be had greater than the price fixed by the building contract. Beyond doubt the only injury sustained by the mere breach of a contract is the loss of the bargain. And this should be the rule applicable whether the action is brought by the contractor or the owner. It is fundamental that the motive of the party who breaches a civil engagement, other than marriage contracts and the like, is no ground for enhancing the damages; and that punitive damages are ordinarily recoverable only in actions sounding in tort. I think the plaintiff in a building contract ought not to be permitted, under the guise of a *quantum meruit*, for the alleged breach of the building contract by the owner, to recover beyond the price fixed in the contract; for the reason that any greater recovery would be, in effect, damages awarded for punishment rather than compensation for loss of a bargain, and therefore opposed to the reason and spirit of the law governing damages for breaches of civil engagements. [See Sedgwick on Damages, Sutherland on Damages, *passim.*] The foregoing is my personal view on a question not necessary to be decided in this case, as will appear in the next paragraph.

V. A maxim that is of the very essence of equity is, "He who seeks equity must do equity." Being a foundation stone upon which equity jurisprudence is erected, this maxim is applied independently of the pleadings in the case, whenever the evidence gives occasion. No court proceeding as in equity **Recovery in** will permit a judgment in favor of the **Quantum** **Meruit:** plaintiff which would deprive the defendant **Payments.** of any equities arising out of the transaction for which a recovery is sought. While I think the answer was broad enough to claim the credits which this maxim would compel, still the defendant is entitled to its application on the proof adduced, whether specifically prayed or not. In the case at bar, defendant was refused credit for the sums of money which it had paid in extinguishment of the liens of sub-

contractors of plaintiff which had been filed or were filable at the time plaintiff abandoned the contract. The referee in this case, though having before him the witnesses who performed the work and who admitted they had been paid in full therefor according to their respective contracts with plaintiff before he left the building, refused to allow any credit for such payments, but charged against defendant a larger sum than these contractors received for the actual performance of the work, upon the theory that the reasonable value of the work was greater than the sum for which they agreed to perform it, and in making this charge against defendant, the referee did not compel the plaintiff to deduct therefrom the amount which defendant had actually paid for the work in question. Plaintiff himself never performed any of this work and confessed on cross-examination that he was not indebted to any sub-contractor (defendant having paid them) for work done in and about the construction of this building, notwithstanding which he was allowed to recover $4800 in his action of *quantum meruit* without crediting any portion thereof which had been paid by defendant to the sub-contractors and received by them in full satisfaction of their demands. The very idea upon which plaintiff's action is brought is that *in equity and good conscience* he ought to recover above the contract price of his sub-contractors whatever sum the testimony tended to show was the reasonable value of the work and labor done by them. It has been shown by the decisions of this court that it became the duty of the trial court, to review the report of the referee and make its own findings as in an equity case. In so doing it was necessarily the duty of the trial court, in addition to those reductions which it made, to have reduced the $4800 recovered as the reasonable value of the work, by so much thereof as defendant had paid in satisfaction of the claim of the men who did the work, and it was the duty of the trial court to have compelled this reduction as "the price of the judgment" to be recovered by plaintiff in a court investigating his demands upon

the basis of their justice and equity. The contrary judgment rendered by the trial court was violative of the fundamental maxim that "he who seeks equity must do equity." Nor can it be justified, as the majority opinion undertakes, because defendant did not specifically plead its right to these credits; for the rule is established that this maxim is applicable even though not called for by the *pleadings* of defendant.

On this point it is aptly stated by SHERWOOD, J., after giving instances of the application of this maxim, viz: "The above are only a few out of a large number of examples which might be cited in illustration of the rule referred to, which finds its application *not* in *questions of pleading,* nor by what the plaintiff offers to do therein, but in the form and frame of the orders and decrees both interlocutory and final, whereby equitable terms are imposed as a condition precedent to equitable relief granted." (Italics ours.) [Whelan v. Reilly, 61 Mo. l. c. 570; affirmed in the same language, Kline v. Vogel, 90 Mo. l. c. 245; affirmed upon a full review of the authorities in Paquin v. Milliken, 163 Mo. l. c. 109; affirmed in principle by WOODSON, J., in Baumhoff v. Grueninger, 178 S. W. l. c. 104.]

To demonstrate beyond cavil that plaintiff is a mere contracting "profiteer" of this inequitable allowance by the referee and the circuit judge, I quote the following from his own testimony on the trial. The attention of the plaintiff was called to what had been paid to him and to what had been disbursed by him to the sub-contractors, leaving a balance in his pocket of $693.77, after which he was asked the following questions and made the following answers:

"Mr. Kinealy: Now Mr. Johnston, is there outstanding on your part any liability unpaid on account of work done by you on this building? A. No, sir.

"Q. Or anybody else on the building? A. No, sir, nothing.

"Q. You are not indebted to anybody? A. No, sir.

274 Sup. 31.

"Q. And the total amount that you paid out was $8806.23? A. Yes.

"Q. So that on the transaction as it stands to-day, then, you have no outstanding liabilities on account of this work? A. No, sir.

"Q. And you are $693 cash to the good? A. I believe that is right."

Again the plaintiff's attention was called to the fact that he claimed $12,920.68 in his present suit; that after he left the work $7089.82 were paid, under written orders of plaintiff, to his sub-contractors, who continued to work for the defendant, wherefore plaintiff's present claim involved an excess of $5830. After so admitting the plaintiff further stated: "I believe I said yesterday that if I had gone on and completed the contract I would have realized a profit of $650." It is thus apparent, out of the mouth of plaintiff himself, who previously admitted that he had $693.75 in his pocket, leaving him without any indebtedness to any person on account of this building, that he had already received more than the profit he would have obtained had he completed his original contract, regardless of any recovery.

The very witnesses for whose work and labor plaintiff got judgment upon an increased valuation, testified they had been paid in full by defendant according to their original contracts. For these actual payments defendant got no credit as against a charge on the increased value put on the work and labor by the men who have been paid in full. This was an inequitable donation. In any view of the extent to which plaintiff might recover on this claim, he should have been compelled to do equity by crediting on the theoretical value of the work and labor, what had been paid to the sub-contractors. By refusing this credit defendant has been adjudged to pay the sub-contractors according to their respective contracts in full and, again, to pay plaintiff for the same work and labor, the greater sum which the sub-contractors testified it was worth without any deduction for the payments to them.

This unrighteous judgment is in violation of the maxim "that he who seeks equity must do equity;" and for that reason it should be reversed and the cause remanded, with directions to compel plaintiff to accord cerdit for the sums paid by defendant to the subcontractors in extinguishment of their lienable claims. *Walker* and *Woodson, JJ.,* concur in these views.

BLAIR, J. (concurring).—I. The majority opinion quotes all of Section 35, Revised Statutes 1825, vol. 2, p. 630, pertinent to the question under discussion. It goes no further than to say that in case parties entitled to a jury waived it, the case was then triable by the court or a referee, at *the court's option;* not at the option of the parties.

**Compulsory Reference.**

The majority opinion holds that to this extent, and only to this extent, a reference, in such circumstances, is compulsory. Such reference was as much compulsory, if ordered, as when ordered in a case involving a long account. In the one instance the presence of the account is the condition precedent to compulsory reference. In the other, under Section 35, supra, the waiver of the jury was the condition which brought the power to refer compulsorily into existence.

II. Something is said about the Reference Act of 1825 being taken from the Territorial Laws. The majority opinion gives correctly the development and growth of the Reference Statute from the admission of the State into the Union until the present time. It is literally correct in the statement that the Revised Statutes of 1825 contained the first reference statutes of the *State.* It was the first enacted by the State Legislature. No point is made or can be made on the source whence they were taken.

**First Reference Statute.**

III. In an effort to break the force of the clear language of Section 2013, Revised Statutes 1909, Johnson v. Goult, 106 Wis. l. c. 251, is cited. In State ex

Wisconsin
Practice:
Difference
in Powers
of Trial and
Appellate
Courts.

rel. v. People's Ice Co., 246 Mo. l. c. 210, a red lantern was hung at the entrance to this trail. It has been ignored, in the dissenting opinion, with the usual result. Johnson v. Goult held merely that a *trial court* was empowered to set aside the report of its referee if it was against the clear preponderance of the evidence. The question of the appellate court's right to weigh the evidence on appeal was not in the record and was *not* discussed. It also appears from other Wisconsin decisions that *any finding* of a trial court may be reversed by the Supreme Court when found to be against the clear preponderance of the evidence. In other words, the mere presence of substantial evidence even in a case tried before the court itself is not sufficient to require an affirmance on that question. The Wisconsin cases must be read in the light of this vital difference between its rule of decision and ours.

IV.    The position taken in the dissenting opinion, that the presence of a long account makes operative the

Action
at Law:
Long
Account.

equitable rule of review is contrary to all the decisions. Further, it would wipe out all jurisdiction at law in cases involving such accounts and convict the Legislature of useless legislation in providing for referees in actions at law. The unescapable result of the contention would be that there could be no compulsory reference in an action at law; that no action at law could involve a long account, since the presence of the long account would constitute the case one in equity, *ipso facto.*

V.    An examination of the authorities relied on in this case to support the contention that this court can

Reviewing
Questions
of Fact.

weigh the evidence in reviewing a judgment entered following the report of a referee, may not be unprofitable.

At one time in the history of this litigation it was insisted that the Reference Statute in this State

was "borrowed" from New York and that there the rule is that the evidence in cases referred is "to be reviewed on appeal." Spence v. Chambers, 39 Hun, 1. c. 196, is cited. The Spence-Chambers case was decided in 1886.

In Borst v. Spelman, 4 N. Y. 284 (1850), the last paragraph of the syllabus reads: "This court cannot review the decision of referees, or the judgment of a subordinate court, where the error is one of fact merely, however clearly the finding may have been against the testimony." In Livingston v. Radcliff, 2 Comstock, 1. c. 190 (1849), the New York Court of Appeals held that only questions of law could be brought up by appeal from judgment on a referee's report; that the code had not affected this rule. In Esterly v. Cole, 3 N. Y. 504 (1850), the same court held: "The court of original jurisdiction may set aside a report of referees when it is either against the weight of evidence or without sufficient evidence to support it. But an appellate court has no such power. . . . We cannot inquire whether the court below in the one case, or the jury in the other, has drawn the proper conclusions of fact from the evidence." The Spence-Chambers case was decided in general term of the Supreme (trial) Court, and, therefore, by "the court of original jurisdiction." It was also decided after some amendments to the statute—amendments we did not "borrow" in 1855. The Court of Appeals of New York prior to our "borrowing" the statute of New York had construed that statute to exclude the very rule announced in the dissenting opinion. Did we take this construction when we took the statute? Assuming the correctness of the contention as to the source of our statute, the construction given it by the cases cited would bind us. It may be added, however, that it was correctly stated in the case of State ex rel. v. People's Ice Co., 246 Mo. 168, that the New York statute was, as a whole, so unlike ours that decisions from that State are valueless on the questions now before this court.

The Missouri decisions cited do not support the conclusion reached in Paragraph II of the dissenting opinion.

Ely v. Ownby, 59 Mo. 437, involved objections to the report of a *receiver*. There, objections were referred. Comment is unnecessary.

Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 484, dealt with a reference *by consent*. It could not possibly have involved the question in this case. Further, the cases it cites in support of the remark relied upon in the dissent in this case are Ely v. Ownby, supra; O'Neill v. Capelle, 62 Mo. l. c. 208; and Smith v. Paris, 70 Mo. 615. The first has been mentioned. The second was a suit in equity. The third was also an equitable proceeding (Smith v. Paris, 53 Mo. 274) and the court puts its ruling as to review on the ground that the "circuit court, as the chancellor, might have disregarded the report of the referee entirely," etc.

In State ex rel. Walker v. Hurlstone, 92 Mo. l. c. 332, 333, the only holding made is that the *trial* court may review the referee's findings. The same ruling was the one made in Wentzville Tobacco Co. v. Walker, 123 Mo. l. c. 671. Small v. Hatch, 151 Mo. 300, was in equity. Lack v. Brecht, 166 Mo. l, c. 257, holds that the *trial* court may review the referee's findings. The court discussed some exceptions and held them all correct. As to the last exception (l. c. 262) GANTT, J., said: "We think the finding of the circuit court and referee that defendant should not be allowed a credit for the furniture bought for the Glasgow Place property was based upon sufficient evidence to sustain that finding, and being on a question of fact, will not be disturbed by this court."

In discussing Smith v. Baer, 166 Mo. 392, the dissenting opinion seems to overlook a portion of it. The court expressly stated that "it must not be understood, however, that it is intended by anything that is said herein, that this court will weigh conflicting evidence in a case of compulsory reference any more than it would in a reference by consent." It was entirely proper

to limit what the court had said and such limitation
is not, in my opinion, *obiter*. Further, the concurring
opinion of VALLIANT, J., shows the court regarded the
question as before them. The reference in Smith v.
Baer, to the failure to file a term bill of exception, has
no bearing on the question here.

State ex rel. v. Woods, 234 Mo. l. c. 26, decides no
question pertinent to the question under examination.

Star Bottling Co. v. Exposition Co., 240 Mo. l. c.
638, is cited. That was a reference by consent, the
court said. In addition, this was what the court declar-
ed it was deciding: "Will an appeal lie from an order
*nisi* granting a new trial when both parties litigant
asked a new trial and one is granted to either?"

State ex rel. v. Reynolds, 245 Mo. 698, was a
prohibition proceeding. The sole question was whether
the amount involved gave this court jurisdiction. The
remarks on review on appeal are wholly beside the
question and are expressly denominated "argument."
Nor did the court rely on this argument, finally, in
reaching its conclusion.

Reed v. Young, 248 Mo. 606, will be read in vain
for any suggestion that the question in the instant case
was presented for decision. The question raised there
was whether the reference violated alleged constitution-
al rights.

State ex inf. v. Arkansas Lumber Co., 260 Mo. l. c.
274, is cited. That decision dealt with a question analo-
gous to that whether a *trial court* could review the
referee's report on the weight of the evidence. In
that case we were dealing with *our own commissioner*.
The right to review on *appeal* could not have been
involved. Nor did the court attempt to decide it.

In Sonnenfeld v. Rosenthal, 247 Mo. l. c. 250, the
court said it was empowered "to review the findings of
fact," but did not then intimate the extent of the re-
view. When it reached the point of applying the rule,
it said (l. c. 264), after setting out the evidence:
"From the foregoing facts we find that there is *sub-
stantial evidence* to sustain the report of the referee

that there was due on the contract a balance of $16,648.86 on February 1, 1892.'' (Italics ours.)    The court sustained this finding of the referee. On page 266 the court said: ''The burden was upon the defendant to show that the judgment is not supported by the evidence, and we cannot convict the referee and the trial court of error in that regard when all the evidence is not before us.''    These applications of the rule give some light on the court's view as to appellate review of findings.

In regard to what is said in the dissenting opinion concerning State ex rel. v. People's Ice Co., 246 Mo. 168, it is only necessary to refer the reader to that decision.    The dissenting opinion so misconceives it that comment is unnecessary.

In Williams v. Railway, 153 Mo. l. c. 511, 512, the court considered the scope of appellate review of a finding by the trial court, made after sustaining an exception to the report of a referee.    It had previously used the language quoted in the dissenting opinion.    In connection with the question above mentioned, however, it held the presumption in such case to be ''in favor of the judicial action of the circuit court whose duty and prerogative it was, in a case like this, to examine the report of the referee in the light of the evidence and affirm or reverse his action.    That decision'' (123 Mo. 662), ''we think is in harmony with our practice in reviewing the granting or refusing of new trials. The presumption is in favor of the action of the trial court and it is *only when we find that it has abused its discretion* [italics ours] do we interfere with its judgment.''    It will hardly be contended this supports the conclusion reached by the dissenting opinion that the evidence may be weighed on appeal.    In fact it is well established that a trial court, in granting or refusing a new trial on the evidence, will not be held to have ''abused its discretion'' unless there is no substantial evidence supporting the party who succeeds on the motion.    This is the rule of the Williams case.    It is the rule of the majority opinion.

Valleroy v. Enright, 179 Mo. App. 553, is cited. The only question presented or decided in that case was whether the *trial court* had power to review and overturn referees' findings.

In Phillips v. Todd, 180 S. W. 1. c. 1043, the Springfield Court of Appeals suggests that, on the new trial, it there orders, the cause *ought to be* referred.

Bond v. Finley, 74 Mo. App. 1. c. 25, is cited. The opinion is by the writer of the dissenting opinion in the case at bar. It holds the *trial court* had the power to "make its own findings upon the evidence reported by the referee."

Vandagrift v. Masonic Home, 242 Mo. 1. c. 154, is cited. This opinion, also, was written by the writer of the dissenting opinion in the instant case. That case was referred *by consent*. It may have been one subject to compulsory reference. The holding to which we are cited is this: "Our conclusion is that the *undisputed facts*" (italics ours) "in this record, which we have re-examined (since the case is one where a compulsory reference might be ordered, Williams v. Ry., 153 Mo. 1. c. 495) clearly sustains the deductions of the referee that," etc. In that case the report of the referee had been confirmed by the trial court, and it is not believed the learned judge who wrote that opinion intended to be understood as holding that in such circumstances this court could weigh the evidence. Obviously, the decision was not intended to run counter to Section 2013, Revised Statutes 1909. In view of this situation in that case doubtless the court, in citing Williams v. Railway, intended to cite it in support of a rule not in conflict with the applicable statute. The only rule applicable in that case was that substantial evidence required an affirmance. [Section 2013.] We conclude, therefore, that the citation of the Williams case amounted to a construction of that case to the effect that the scope of review it warrants is merely to determine whether there is substantial evidence. Unless this was the meaning of the citation, the court must be held to have cited the Williams case to support the application, to

the case it was deciding, of a rule squarely in the teeth of a mandatory statute. This it is impossible for us to believe.

Opposing the conclusion in the dissenting opinion, cases from other states are cited in 246 Mo. 168. It is there stated there is no well considered decision in the Union which holds as does the dissenting opinion in this case. That statement was made as the result of an examination of many cases. It is practically unchallenged in the dissenting opinion, as we read it. As shown above the cases from this State do not support that opinion.

The principle of the dissenting opinion necessarily results in requiring us to review the weight of the evidence in any action at law involving the examination of a long account, whether the case is referred or tried to the court or before a jury.

The rule applied in the opinion prepared by the Chief Justice is the correct one. I concur. *Graves, C. J.,* and *Williams, J.,* concur in these views.